UNITED ELCHEM INDUSTRIES, INC., et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent United Elchem Industries, Inc. v. Commissioner
Docket Nos. 14231-78, 144-79, 160-79, 161-79.
United States Tax Court
T.C. Memo 1981-376; 1981 Tax Ct. Memo LEXIS 368; 42 T.C.M. (CCH) 460; T.C.M. (RIA) 81376; July 23, 1981
*368 Roger J. Allen, for the petitioner in docket No. 14231-78. John W. Collins, Jr., for the petitioners in docket Nos. 144-79, 160-79, and 161-79. William P. Hardeman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Petitioner
Year
Deficiency
14231-78
United Elchem Industries,
[1] 1974
$ 4,032.00
Inc.
[1] 1975 $12,096.00
144-79
Eleanor Keach
1976
$ 1,266.58
160-79
Estate of F. R. Keach, Deceased,
1974
$ 2,464.10
Eleanor Keach, Independent
Executrix and
Eleanor Keach, surviving
wife
161-79
Eleanor Keach
1975
$ 8,363.39
In an amendment to his answer, respondent alleges a deficiency in the income tax of petitioner Eleanor Keach for 1976 in the amount of $ 7,716.89. The increase over the amount stated in the notice of deficiency is due to the correction of an error on respondent's part (more fully explained, infra) wereby he increased her ordinary income by only $ 8,000, instead of $ 25,200. The only issue for decision is whether petitioner United Elchem Industries, Inc. made certain payments to petitioner Eleanor Keach *369 as consideration for the sale of stock or for a covenant not to compete. FINDINGS OF FACT United Elchem Industries, Inc. (Elchem), [2] is a corporation engaged in the business of manufacturing "solvent cements for plastic pipe and some allied cleaners and primers." Elchem filed Federal income tax returns for its fiscal years ended November 30, 1974, and November 30, 1975, with the Internal Revenue Service Center, Austin, Texas. When it filed its petition, Elchem's principal place of business was in Dallas, Texas. Eleanor Keach's (Keach) husband, Forrest R. Keach (decedent), died on April 29, 1974. Keach filed a joint Federal income tax return for 1974 and individual Federal income tax returns for 1975 and 1976 with the Internal Revenue Service Center, Austin, Texas. She also filed a Federal estate tax return for decedent's estate. At the time Keach filed the petitions in docket Nos. 144-79, 160-79, and 161-79, she was a legal resident of Dallas, Texas. [3]
Ed. *370 O. Haltom (Haltom) is an individual who at all times pertinent herein was an officer, director, and stockholder of Elchem. Also at all times pertinent to these cases, Elchem had no more than three stockholders, and it had 1,000 outstanding shares of stock. Sometime during 1969 or 1970, decedent negotiated a "sales agreement" under which his own corporation, the Ray Keach Company (Keach Company), was employed by Elchem as a manufacturer's representative to sell the latter's products in a territory comprising Texas and parts of Oklahoma. This agreement was subject to cancellation by either party upon 30-days' written notice. On March 29, 1972, Haltom and decedent executed a stock purchase agreement, effective March 1, 1972, pursuant to which Haltom conveyed 200 shares of Elchem stock to decedent at a price of $ 30,000. This sum was to be paid in installments over a period of approximately 55 months. In addition to conveying the stock, Haltom agreed to vote his remaining shares "to continue the exclusive licensing arrangement between * * * [Elchem and decedent], or the Keach Company, for the handling and sale" of Elchem products in Texas and parts of Oklahoma during the 55 months. *371 The agreement further provided as follows: Haltom agrees to vote his stock to maintain this [licensing] agreement in force for said period of time, in the event of the death of [Mr.] Keach before the end of said period. [Mr.] Keach agrees, individually and as agent for Keach Company, that neither he nor such Company will, directly or indirectly, handle or assist others in handling any line or lines of merchandise or products which would in any way compete with that sold by * * * [Elchem] during said 55 months period. At the time of decedent's death, the Keach Company, whose only employees were decedent, Keach, and a salesman who had been hired to work in south Texas, was a manufacturer's representative and sold products for approximately ten different manufacturers, including Elchem. None of the other products handled by the Keach Company were "in competition" with the product line that it handled for Elchem. Within approximately 30 days of decedent's death, all manufacturers (including Elchem) that had been represented by the Keach Company terminated their agreements to have that company represent them. [4] *372 After decedent's death, there were discussions between Keach and Elchem concerning the possibility of the Keach Company continuing to represent Elchem. However, the agreement with the Keach Company was terminated because Haltom and other representatives of Elchem believed that the Keach Company, with Keach at the helm, would no longer be capable of representing Elchem on the same level that it had in the past. In general, decedent's work as a manufacturer's representative for Elchem, carried on through the Keach Company, consisted of selling Elchem's products to wholesalers in his assigned territory and servicing any complaints that his customers might have. Sales of Elchem products generated by the Keach Company were, on the average, about one-third of Elchem's total sales. The monthly average of commissions that Elchem paid to the Keach Company during 1971, 1972, and 1973 was $ 2,004.08. As an employee of the Keach Company, Keach maintained sales records and performed secretarial duties for decedent at an "office" in their home. In this connection, *373 she sometimes dealt with customer complaints over the telephone. Keach often traveled with decedent when he attended conventions and when he was on sales trips; however, she has no experience in sales and performed no sales work for the Keach Company. No particular education or expertise is needed in order to sell the products manufactured by Elchem. There are product lines of other manufacturers, competitive to that of Elchem, which are marketed in Texas and Oklahoma. In addition to holding stock in and working as a manufacturer's representative for Elchem, decedent was an officer and director of that corporation. Keach often attended, with the decedent, meetings of Elchem's board of directors and other meetings wherein discussions took place concerning various matters of corporate business, including new products, product promotions, plans for investment, and plans for internal operations. On December 10, 1972, Elchem's board of directors (which at that time included Haltom and decedent) adopted a resolution to "prepare and implement a [stock] Buy-Sell Agreement, based on $ 400.00 valuation to be partially funded with insurance policies." With respect to this resolution, Elchem's *374 corporate minutes state in part as follows: (1) United Elchem owns insurance on the following Officers in the following amounts: Haltom
$ 160,000
Locashio
160,000
Keach [decedent]
50,000
In the event of the death of any of the above, their estate shall have the option to sell their stock to the Corporation at the $ 400.00 valuation with the insurance amount to immediately pass to the estate, the balance to be paid over a two-year period with interest. The decedent's estate shall have the option to retain the stock if they so desire. (2) The valuation of the stock shall be reviewed each year and revalued, based on the present worth of the Company as determined by one of the accepted accounting methods. At a meeting held on February 5, 1974, Elchem's board of directors decided that the above insurance policies on the lives of its officers should be dropped. [5] Haltom suggested that decedent keep the insurance policy on decedent's life in force by continuing to pay the premiums himself. Decedent decided that he would pay the premiums, and the process of transferring ownership and assignating a new beneficiary (Keach) of the policy was begun. Decedent and Keach reimbursed Elchem for the *375 cost of the February 1974 premium, which had already been paid by Elchem, and they later paid the March and April 1974 premiums directly to the insurance carrier (National Fidelity). Subsequent to decedent's death on April 29, 1974, both Keach and Elchem made claims to the proceeds of the insurance policy on his life. A letter to National Fidelity from an attorney for Elchem, dated May 24, 1974, states that the basis of Elchem's claim was "in the circumstances surrounding * * * [its] agreement to transfer the policy to Mrs. Keach." National Fidelity, in a letter dated May 29, 1974, acknowledged that a "change of ownership and a change of beneficiary form were completed just prior to the death of" decedent; however, the letter implied that payment of benefits under the policy would be withheld until Keach and Elchem got together and resolved their conflicting claims. The minutes of the regular monthly meeting of Elchem's board of directors on May 8, 1974, state in part as follows: It was resolved that the stock valuation in our buy/sell agreement, which was ratified in our December 10, 1972 meeting *376 be revalued to $ 1,250.00 per share based on the present worth of the company. It is further resolved that insurance should be purchased in the following amounts to funds the agreement: Haltom
$ 500,000.00
Locahsio [sic]
$ 500,000.00
Notwithstanding the reference in these minutes to the "buy/sell agreement, which was ratified in our December 10, 1972, meeting," no buy-sell agreement had ever been implemented by Elchem's board of directors. At about the same time that she made a claim to the insurance proceeds from the National Fidelity policy, Keach offered to sell to Elchem the 200 shares of its stock that decedent had purchased for $ 30,000 in March 1972. Elchem offered her $ 80,000 for the stock, with the proviso that she release and assign to Elchem any claim she might have to the life insurance proceeds. Keach rejected this offer, and she was told that she could "make wallpaper out of the stock" if she didn't agree to "the insurance deal." After further negotiations, Keach and Elchem executed a tentative "SALES AGREEMENT" on June 14, 1974, "for the purpose of establishing the intent of the parties" to the agreement. Pursuant thereto, Elchem agreed to pay Keach and/or decedent's *377 estate $ 100,000 for the following: 1. Purchase of the 200 shares of United Elchem Industries, Inc. stock owned by the estate of F. Ray Keach. 2. Release of the territory presently represented by the Ray Keach Co. effective July 31, 1974. United Elchem Industries, Inc. will also pay approximately 16,500.00 to Ed O. Haltom, Jr. to retire the note dated March 29, 1972 from Ray Keach to Ed Haltom and the stock purchase agreement for the 200 share [sic] of United Elchem Industries, Inc. stock dated 3-29-72 to which the note applies. 3. United Elchem Industries, Inc. will receive the proceeds from the $ 50,000.00 National Fidelity policy on Ray Keach's life which was in the process of being assigned to Eleanor Keach at the time of Ray Keach's death. 4. United Elchem Industries, Inc. will continue to carry hospitalization and the Southwestern Life term insurance on Eleanor Keach and Cal Keach until Eleanor Keach's 65th birthday. 5. United Elchem Industries, Inc. will pay the medical reimbursement due to Ray Keach until his death. Under the tentative agreement, Elchem was to pay $ 21,750 to Keach as soon as it received the proceeds from the insurance on decedent's life. The balance *378 ($ 78,250) was to be paid in equal installments over a 3-year period beginning June 30, 1974, and a portion of those payments could "be made as salary." The agreement also contained the following general provisions: Eleanor Keach and the Ray Keach Company agree not to compete with United Elchem Industries, Inc. and agrees [sic] to cooperate in an advisory capacity for the 3 year period [over which the $ 100,000 will be paid]. This entire agreement by United Elchem Industries, Inc. is subject to the receipt of the $ 50,000.00 proceeds from the National Fidelity policy on Ray Keach's life. Finally, Keach and Elchem agreed to "execute the legal documents setting forth the full agreement of the parties in detail." On September 4, 1974, Keach signed an employment agreement under which she was to work for Elchem "in an administrative or sales capacity" for a term of 3 years, beginning May 1, 1974. [6] The agreement provided that Keach could hold other employment during the 3-year term and that she would be working for Elchem no more than 50 hours per month. As compensation, Elchem agreed to pay Keach $ 200 per month for the 3-year period of employment and to provide her with hospitalization *379 and term life insurance until she reached the age of 65. Also on September 4, 1974, Elchem and Keach (in her individual capacity, as executrix of decedent's estate, and as an authorized representative of the Keach Company) executed an agreement stating that the closing and performance of any other agreement between them was subject to the receipt by Elchem of the proceeds of the insurance policy on decedent's life. On the same day, Keach (in her individual capacity and as executrix of decedent's estate) signed a release of any and all claims that she had to the proceeds of the insurance. In a "BILL OF SALE" executed on September 18, 1974, Keach (individually and as executrix of decedent's estate) conveyed to Elchem 200 shares of its own stock for a stated consideration of $ 30,000. On the same day, Elchem and Keach (individually, as executrix of decedent's estate, and as an authorized representative of Keach Company) signed a noncompetition agreement effective for a 3-year period beginning August 1, 1974. For a stated consideration totaling $ 75,600, *380 to be paid in monthly installments of $ 2,100 during the term of the agreement, Keach (in all of the capacities enumerated above) agreed not to complete with Elchem in Texas and parts of Oklahoma as to any of the customers previously serviced by the Keach Company on Elchem's behalf or as to any of Elchem's products. [7] Elchem was award, during the negotiations between it and Keach, that payments made in consideration of a covenant not to compete are deductible for Federal income tax purposes. One of Elchem's major concerns in finalizing the agreements between it and Keach was to allocate as much of the total consideration as possible to the noncompetition agreement. Keach's primary concern during the negotiations with Elchem was with the total amount of consideration that she would receive as a result of the various agreements. She was aware that, as a minority stockholder in a closely-held *381 corporation like Elchem, she would have a difficult time selling her stock to "outsiders." She acceded to Elchem's demand that she release her claim to the insurance on defendant's life, and accepted the allocation of consideration stated in the September 18, 1974, agreements ($ 30,000 for the stock and $ 75,600 for the covenant not to compete), because she believed that otherwise the insurance money would be tied up in protracted litigation and Elchem would refuse to buy her stock. A document dated September 4, 1974, but not signed by Keach until some 2 days later, states as follows: I understand that United Elchem is going to treat the payments to me on the non-competitive agreement effective August 1, 1974 as deductible expenses and acknowledge that I will treat these payments as ordinary income on my tax returns. /s/ Eleanor Keach / Eleanor Keach Keach signed this document because she believed that, if she did not sign it, Elchem would withhold the $ 2,100 monthly installments due her under the noncompetition agreement. [8] *382 Throughout the negotiations leading to the various agreements between Keach and Elchem, Keach was represented by and consulted with an attorney and an accountant. All documents finalizing the agreements were reviewed by the attorney prior to Keach's execution of them. Stock valuations are often made based on a multiple of a corporation's earnings. From November 30, 1971 through june 30, 1974, Elchem's average yearly net income (after taxes, salaries, bonuses, profit-sharing contributions, and other expenses) was $ 26,382. With reference to 20 percent of this net income figure, several possible valuations for a 20-percent ownership interest in Elchem as a multiple of earnings would be as follows: 20 Percent of
Value of 20-Percent
Net Income
Multiple
Interest
$ 5,276
5
$ 26,382
$ 5,276
7
$ 36,935
$ 5,276
10
$ 52,764
As of June 30, 1974, the book value of a 20-percent interest in Elchem was $ 22,652. At that time, Elchem's assets consisted primarily of inventory and receivables. It had no real property. On the Federal estate tax return filed by Keach for decedent's estate, the date of death value reported for 200 shares of *383 Elchem stock was $ 90,000. Elchem made payments of $ 2,100 per month to Keach during part of its fiscal year ended November 30, 1974, totaling $ 8,400. It made monthly payments to her in the same amount during its entire fiscal year ended November 30, 1975, totaling $ 25,200. On its Federal income tax returns for fiscal 1974 and 1975, Elchem claimed deductions for these payments as "commissions" paid pursuant to a covenant not to compete. Respondent subsequently disallowed the deductions claimed by Elchem on the ground that it had not been established that the payments were for a covenant not to compete. Keach received monthly payments from Elchem during 1974, 1975, and 1976 [9] *384 in the total amounts of $ 10,500, $ 25,200, and $ 25,200, respectively. No portion of the amounts received by Keach in 1974 and 1975 was included in the income reported on her Federal income tax returns for those years. [10] On her 1976 tax return, Keach reported $ 8,000 of the $ 25,200 received from Elchem in that year as long-term capital gain from the sale of Elchem stock. in notices of deficiency issued to Keach for 1974 [11] and 1975, respondent determined that she had received unreported income from Elchem in the respective amounts of $ 10,500 and $ 25,200 under a covenant not to compete. [12] *385 As to 1976, respondent determined in his notice of deficiency that the $ 8,000 reported by Keach as capital gain was instead ordinary income received under a covenant not to compete. In an amendment to the answer filed in docket No. 144-79, respondent alleges that he erroneously included only $ 8,000 of the amount received by Keach in 1976 as ordinary income, whereas the entire $ 25,200 received by her in that year should have been included in her ordinary income. OPINION Having taken inconsistent positions in the determined deficiencies in these consolidated cases, respondent is in the position of a stakeholder and is primarily concerned that the transactions in question be treated uniformly for tax purposes as to both parties. On brief, however, he urges the position taken by Elchem, i.e., tht the tax treatment of monthly payments made to Keach by Elchem must be determined by reference to the express terms of their stock sale and noncompetition agreements. [13] Thus, both respondent and Elchem argue that Keach may not treat any portion of the payments made pursuant to the noncompetition agreement as being consideration for her sale of 200 shares of Elchem stock. Keach argues that, notwithstanding the written agreements between her and Elchem, the payments that she received were for the sale of the stock and not for the covenant not to compete. If this were true, then *386 Keach would be entitled to treat the payments as capital gains, rather than ordinary income, and Elchem would not be entitled to deduct them as ordinary and necessary business expenses. See Sonnleitner v. Commissioner, 598 F.2d 464, 466-467 (5th Cir. 1979), affg. a memorandum Opinion of this Court. In support of her position, Keach contends that she signed the contracts between her and Elchem while under duress and undue influence. In this connection, she argues that the noncompetition agreement was not separately negotiated for at arm's-length and that there was no basis in fact or economic reality for Elchem to assign a value of $ 75,600, or any other sum, to that agreement. She contends, in essence, that Elchem insisted on a noncompetition agreement for the sole purpose of obtaining a tax benefit that it would not otherwise have been entitled to in purchasing the stock. In cases where a taxpayer asserts a position that is inconsistent with the terms of a written agreement to which he was a party, this Court requires "strong proof" that the writing does not reflect the true substance of the agreement in light of economic reality and the intent of the parties. Eg., Major v. Commissioner, 76 T.C. 239 (1981); *387 Lazisky v. Commissioner, 72 T.C. 495, 501 (1979), affd. subnomMagnolia Surf, Inc. v. Commissioner, 636 F.2d 11 (1st Cir. 1980); Schmitz v. Commissioner, 51 T.C. 306, 316-318 (1968), affd. subnomThrondson v. Commissioner, 457 F.2d 1022 (9th Cir. 1972). The Fifth Circuit, to which an appeal would lie in this case, has applied the "strong proof" rule in cases similar to the one at bar. Sonnleitner v. Commissioner, supra; Dixie Finance Co. v. United States, 474 F.2d 501 (5th Cir. 1973), affg. Memorandum Opinions of this Court; Balthrope v. Commissioner, 356 F.2d 28 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; Barran v. Commissioner, 334 F.2d 58 (5th Cir 1964), affg. in part 39 T.C. 515 (1962). In the instant case, we agree with Elchem that Keach has failed to establish by strong proof that payments made pursuant to the noncompetition agreement were in reality additional consideration for the purchase of stock. [14] *388 *389 Contrary to Keach's contentions, we think the noncompetition agreement was separately bargained for and had a basis in economic reality. Subsequent to decedent's death, Keach discussed with Elchem the possibility of the Keach Company continuing to represent Elchem. As a result of her work for the Keach Company during decedent's life, Keach was familiar with Elchem's products and with its customers in the territory in which the Keach Company had been representeing Elchem. She had no personal experience in sales work, but the Keach Company had one salesman in its employ and, as Keach herself stated at trial, she could have hired a salesman. Although Elchem did not wish to continue its employment of the Keach Company, it certainly had legitimate grounds for fearing that Keach might use the Keach Company to present one of Elchem's competitors in the territory that had previously been assigned to the Keach Company. [15] *390 Negotiations between Elchem and Keach regarding the sale of the Elchem stock held by her took place over a period of some 3 to 4 months. Elchem first expressed its desire for a noncompetition agreement early in the negotiations, on or about June 14, 1974, when it and Keach executed a tentative sales agreement including a covenant not to compete. On or about September 6, 1974, Keach signed a document acknowledging that she would treat payments received under a noncompetition agreement with Elchem as ordinary income. [16] The final noncompetition and stock sale agreements were not signed until September 18, 1974. Throughout these lengthy negotiations, Keach was represented by and consulted with her attorney and accountant, and the attorney reviewed all documents before she signed them. In these circumstances, we find that the noncompetition agreement was separately negotiated for at arm's-length. See Balthrope v. Commissioner, supra at 33-34. *391 Clearly, this is not a case where a taxpayer unwittingly agreed to a covenant not to compete in connection with a stock sale transaction. [17] Keach signed the agreements in question with foreknowledge of the consequences and only after consulting with her attorney. We also find without merit Keach's argument that she was compelled to sign the noncompetition agreement as a result of duress or undue influence. To support such a claim, it is incumbent upon Keach to show, interalia, some wrongful act or threat on the part of Elchem. See Sonnleitner v. Commissioner, supra at 468-469; Finch v. McVea, 543 S.W.2d, 449-452 (Tex. Civ. App. 1976); Shurtleff v. Giller, 527 S.W.2d 214 (Tex. Civ. App. 1975). It is true that, unfortunately for Keach, she was in an inferior bargaining position during the negotiations with Elchem. However, we are unable to find duress or undue influence simply because Elchem threatened not to buy the stock unless Keach would sign a noncompetition agreement. Elchem had made no binding commitment to purchase the stock. Similarly, *392 the fact that Elchem insisted that Keach release her claim to the proceeds of the insurance on decedent's life will not support a finding of duress or undue influence. So far as it appears from the record, Elchem had a legitimate claim to the insurance proceeds. [18]
Finally, Keach argues that if some portion of the total consideration that she received from Elchem must be considered to be attributable to the noncompetition agreement, then the Court should disregard the amount stated in the agreement and allocate to it "only a small amount, certainly not in excess of $ 5,000." Having found that the noncompetition agreement was negotiated for by Elchem and accepted, albeit reluctantly, by Keach, we would be hesitant to substitute our judgment as to its value for that of the parties. [19] See Balthrope v. Commissioner, supra at 34. We hold that the entire amount of the monthly payments made by Elchem to Keach during the years in question were *393 in consideration of the noncompetition agreement.[20]
To reflect the foregoing, Decision will be entered for the petitioner in docket No. 14231-78. Decision will be entered under Rule 155 in docket *394 No. 144-79. Decisions will be entered for the respondent in docket Nos. 160-79 and 161-79. Footnotes
1. Cases of the following petitioners are consolidated herewith: Eleanor Keach, docket Nos. 144-79 and 161-79, and Estate of F. R. Keach, Deceased, Eleanor Keach, Independent Executrix and Eleanor Keach, surviving wife, docket No. 160-79.↩
1. Fiscal year ended Nov. 30.↩
2. References to Elchem will sometimes include generally its officers and directors.↩
3. Keach has petitioned the Court both in her individual capacity and on behalf of the estate of F. R. Keach in her capacity as independent executrix.↩
4. At the time of decedent's death, Apr. 29, 1974, there were some 29 months remaining with respect to Haltom's agreement to vote his stock to maintain the "licensing arrangement" between Elchem and Keach Company.
5. In fact, Elchem retained the policies on the lives of its officers other than decedent.↩
6. On Sept. 18, 1974, Keach and Elchem modified the agreement to establish June 1, 1974, as the beginning date of the 3-year period.↩
7. The noncompetition agreement also contained an acknowledgement by Keach that the "sales agreement" between Keach Company and Elchem, "together with all supplements or amendments thereto, whether with Elchem or any stockholder of Elchem, has been terminated and is hereby declared null and void."↩
8. Apparently, a noncompetition agreement similar to the Sept. 18, 1974, noncompetition agreement described in the text, supra, was signed by Keach and Elchem on Sept. 4, 1974. However, that agreement was not placed in evidence.
9. The deductibility of the payments made by Elchem in fiscal year 1976 are not in issue because it agreed to an extension of the statute of limitations on assessment for that year. 10. Apparently, Keach's accountant treated the amounts received in 1974 and 1975 as a return of basis in the 200 shares of Elchem stock.↩
11. The deficiency notice for 1974 was issued to Keach in her individual capacity and in her capacity as executrix of decedent's estate. ↩
12. For both 1974 and 1975, respondent determined in the alternative that Keach had received the unreported income from the sale of stock to Elchem. This alternative determination is to apply in the event it is held that the amounts were not received under a covenant not to compete.
13. Although the stock sale and noncompetition agreements were formalized in separate documents, they were for all practical purposes part of a single agreement and will be so treated herein.↩
14. Respondent and Elchem urge that we apply in the present case the strict rule of Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), remg. 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), that-- a party can challenge the tax consequence of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. In the recent case of Spector v. Commissioner, 641 F.2d 376 (5th Cir. 1981), revg. and remg. 71 T.C. 1017 (1979), the Fifth Circuit adopted the Danielson rule in a case involving the question whether a transaction constituted the sale of a partnership interest, creating long-term capital gain under sec. 741, I.R.C. 1954, or a liquidation of the partnership interest, yielding ordinary income under sec. 736(a)(2), I.R.C. 1954. However, the court in that case expressly reserved decision as to the extent the Danielson rule would be applied in cases involving contractual allocations to covenants not to compete. Although the Court further stated that the Danielson rule is "not inconsistent with" the principles it had previously applied in such cases, we find it unnecessary in this case to choose between the Danielsonrule and the "strong proof" rule as it has been applied by this Court.
15. The Fifth Circuit has stated that, where a taxpayer challenges the economic reality of a covenant not to compete, the threshold question presented is whether "reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Sonnleitner v. Commissioner, 598 F.2d 464, 467 (5th Cir. 1979); affg. a Memorandum Opinion of this Court, quoting Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235↩ (1960).
16. This document was not a contract, and we have not treated it as having any legal effect. See footnote 8 and accompanying text, supra↩.
17. Compare Stewart v. Commissioner, T.C. Memo. 1971-114, affd. subnomDixie Finance Co. v. United States, 474 F.2d 501↩ (5th Cir. 1973).
18. No conclusive evidence was presented by Keach to show that only she had a rightful claim to the insurance proceeds. Therefore, we think she errs in her argument that $ 50,000 of the consideration that she received from Elchem was "her own money."↩
19. As evidence that the stock was worth the entire amount that she received from Elchem, Keach emphasizes that she reported a basis of $ 90,000 ($ 450 per share) on decedent's estate tax return and that Elchem's corporate minutes contain references to stock valuations of $ 400 per share as of Dec. 10, 1972, and $ 1,250 per share as of May 8, 1974. There is no evidence showing the basis for these valuations. On the other hand, Elchem put forth evidence that the book value of a 20-percent interest in its stock was $ 22,652 as of June 30, 1974, and that the value of a 20-percent interest as a multiple of earnings ranged from $ 26,382 to $ 52,764. In this connection, we note that it appears from the record that Keach received not only $ 30,000 for her 200 shares of stock, but she was also relieved of a $ 16,500 indebtedness on the stock. ↩
20. The evidence of record is clearly sufficient to carry respondent's burden of proof as to the increased deficiency alleged in the amendment to his answer.↩