ESTATE OF RALPH E. LENHEIM, DECEASED, WILLIAM R. LENHEIM AND BERNARD J. LENHEIM, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Lenheim v. Commissioner
Docket No. 38464-87
United States Tax Court
T.C. Memo 1990-403; 1990 Tax Ct. Memo LEXIS 420; 60 T.C.M. (CCH) 356; T.C.M. (RIA) 90403; August 1, 1990, Filed Decision will be entered under Rule 155. Kenneth E. Mitchell, for the petitioner. Margaret S. Rigg and Bryce A. Kranzthor, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $ 230,803. In his amended answer, respondent asserts an increased estate tax deficiency of $ 384,868. The issues for decision are: 1. Whether, in determining the estate tax imposed under section 2001, [1] *421 section 2504(c) precludes respondent from valuing certain lifetime gifts made by the decedent at valuations higher than those reported on his gift tax returns; 2. The fair market values, at the date of several gifts, of shares in a family-owned corporation which had been gifted during decedent's lifetime; 3. The fair market value, at death, of the remaining shares decedent owned in the same family-owned corporation; and 4. Whether the family-owned corporation's sale of its subsidiary to decedent's son was a bargain sale resulting in a lifetime gift by decedent. FINDINGS OF FACT The parties' stipulation of facts and exhibits are incorporated by this reference. The decedent, Ralph E. Lenheim, a resident of Alameda County, California, died on April 17, 1984. He was survived by his three sons, William, Bernard, and Steven Lenheim. At the time of the filing of the petition, William and Bernard Lenheim, the estate's executors, each resided in California. At his death, decedent owned 3,372 shares or approximately a 20.8-percent stock interest in Nor Cal Metals, Inc., his family's company. The corporation at that point owned several pieces of commercial real estate and note receivables and was essentially a passive investment company. Previously, the corporation had sold off its stock ownership interests in two other operating companies. Decedent had started the company and over the years had gifted corporation shares to his sons. This case involves a number of decedent's gifts of shares in the family corporation during 1981, 1982, 1983, and 1984. Nor Cal Metals, Inc.
Nor Cal Metals, Inc. (Metals), is a California corporation. *422 After incorporation in 1955, Metals conducted a job shop metal fabrication business which decedent had earlier owned and operated as a sole proprietorship. The company's place of business was in Oakland, California, and it served customers throughout the San Francisco Bay area. In 1960, Metals transferred its metal fabrication business to another company in which it held a 50-percent interest, Nor Cal Metals Fabricators, Inc. (Fabricators), which company is more fully described, infra. In addition to its 50-percent interest in Fabricators, Metals has owned various pieces of commercial real estate which it generally leased to tenants on a net lease basis. On April 1, 1982, Metals, concurrent with the sale of its 50-percent interest in Fabricators, purchased an industrial supplies business. The acquired business was transferred to Metals' newly formed, wholly owned subsidiary, Roll Rite, Inc. (New Roll Rite), all of which is more fully described, infra. Since its incorporation, all of Metals' issued and outstanding shares have consisted of a single class of voting common stock. Originally, decedent had owned most of the shares. Over the years he frequently gifted equal amounts *423 of Metals' stock to his three sons. Immediately prior to November 24, 1981, decedent owned 12,702 shares or approximately 65.9 percent of Metals' 19,272 outstanding shares. The remaining shares in the company were owned in equal proportions by his three sons, William, Bernard, and Steven Lenheim. On November 24, 1981, decedent gifted 560 of Metals' shares to each son. On January 4, 1982, he gifted 330 of his shares to each son. Steven Lenheim strongly disagreed with his father's decision during January 1982 to have Metals acquire the industrial supplies business. Steven further felt excluded from the company's management. As a result, Steven demanded that his Metals' shares be redeemed in exchange for $ 368,500. After negotiation, Metals redeemed Steven's 3,080 shares on May 28, 1982. Steven, in exchange, received $ 125,000 cash and a 12-percent interest per annum promissory note in the amount of $ 243,500. Minimum monthly payments of $ 5,416.12 were to be made on this note, beginning July 1, 1982. Following the redemption, Steven received no further gifts of company shares from decedent. Decedent, in his last will dated November 26, 1982, bequeathed his remaining Metals *424 shares to his other two sons, William and Bernard. During January 1983, decedent gifted 330 shares each to William and Bernard. On January 10, 1984, he gifted 3,000 additional shares each to William and Bernard. At death, on April 17, 1984, decedent owned 3,372 shares or approximately 20.8 percent of Metals' 16,192 outstanding shares. As a result of the gifts discussed above, the decedent's and his three sons' stock ownership in Metals on the dates indicated, were as follows: Date Decedent William Bernard
Steven
Total
Outstanding
11/24/81
11,022(57.1)
2,750(14.3)
2,750(14.3)
2,750(14.3)
19,272
1/4/82
10,032(52.0)
3,080(16.0)
3,080(16.0)
3,080(16.0)
19,272
5/28/82
10,032(62.0)
3,080(19.0)
3,080(19.0)
--
16,192
1/83
9,372(58.0)
3,410(21.0)
3,410(21.0)
--
16,192
1/10/84
3,372(20.8)
6,410(39.6)
6,410(39.6)
--
16,192
4/17/84
3,372(20.8)
6,410(39.6)
6,410(39.6)
--
16,192 Under an October 2, 1979, Restrictive Stock Agreement, decedent and his three sons each agreed that any transfers of decedent's Metals' shares during his lifetime or upon his death would generally be restricted. The agreement's stated purpose was to prevent disruption of the company's management and business by avoiding transfers of its stock to outside parties. *425 Prior to the making of any transfer, the company and then the other shareholders, in proportion to their stock holdings, were to have successive options to purchase the subject shares at prices established under the agreement. The agreement specifically excepted any shares which decedent may transfer at death from this successive option arrangement. For lifetime transfers of shares, the Restrictive Stock Agreement provided that the option price was to be based upon the company's net book value per share as determined from its most recent financial statements. For transfers caused by a shareholder's death, the option price was to be derived pro rata from the sum of: (1) The book value of the shares the company held in Fabricators ($ 25,000) and (2) the fair market value of the company's business and other assets (determined assuming such assets were sold for cash within 180 days and with no value allocated to goodwill or trade name). Real Estate Owned by Metals
From January 1, 1981, until April 1, 1982, Metals owned improved real property at the following addresses: (1) Third Street, Oakland, California; (2) 2360 Alvarado Street, San Leandro, California; and, (3) 823 Estabrook Street, *426 San Leandro, California. From April 1, 1982, through April 17, 1984, Metals owned the following pieces of improved real estate: (1) 8399 Edgewater Drive, Oakland, California; (2) 2360 Alvarado Street, San Leandro, California; and, (3) 823 Estabrook, San Leandro, California. Previously, Metals had operated its job shop metal fabrication business at the Third Street, Oakland, California, property. Following its 1960 transfer of that business to Fabricators, Metals had leased the Third Street property to Fabricators. On April 1, 1982, in connection with a sale of its 50-percent interest in Fabricators and acquisition of the New Roll Rite business, Metals exchanged the Third Street property for the 8399 Edgewater Drive property. Metals then allowed New Roll Rite, its wholly owned subsidiary, to use the Edgewater property rent-free. During 1982 and 1984, Metals and the Lenheims had the company's real estate appraised. The real estate appraiser determined the properties had the following fair market values on the dates indicated: Property
Date Market value
8399 Edgewater
May 1982
$   750,000  February 1984
950,000  2360 Alvarado
January 1982
950,000  February 1984
1,130,000  823 Estabrook
January 1982
135,000  February 1984
137,500  Third Street
January 1982
515,000  During *427 the 1982 negotiations for the disposition of the Third Street property and the acquisition of the Edgewater property, the Lenheims and their representatives had similarly valued the Third Street property at $ 515,000 and the Edgewater property at between $ 700,000 to $ 800,000. Metal's accountant, Earl Cothran (Cothran), assisted Metals in its negotiations to acquire the industrial supplies business and the Edgewater property. He recalled that the Lenheims and their representatives felt the Edgewater property was "surely worth" between $ 700,000 to $ 800,000. They were further convinced that the Roll Rite business had net current assets worth between $ 600,000 to $ 700,000. Thus, they readily agreed to pay the $ 1.5 million price demanded for both the business and the Edgewater property. They believed paying only a $ 1.5 million price would be a "fine deal." Metals would be buying the New Roll Rite business for an amount not much beyond the business's immediate liquidation value. While the April 1, 1982, agreement (under which the Edgewater and the Third Street properties were exchanged) recited that each property was worth $ 515,000, Cothran understood that the Edgewater property *428 was intentionally undervalued for tax reasons. This permitted Metals to allocate more of the overall purchase price to the acquired business's inventory and other depreciable equipment. The 1982 and 1984 appraisals of Metals' real estate do not reflect any discount for certain of the properties being subject to leases paying less than fair market rental value. As to the properties encumbered by existing leases, the remaining lease term, lease rent, and estimated market rent (as contained in appraisal reports) were as follows: Remaining
Monthly
Estimated
Appraisal
Lease
Lease
Monthly
Property
Date
Term
Rent
Market Rent
2360 Alvarado
January 1982
35 months
$ 5,048
$ 9,082
February 1984
10 months
5,048
9,908
823 Estabrook
January 1982
18 months
500
1,096
February 1984 month-to
1,000
1,206 -month 1121 Third
January 1982
* 56 months
2,700
5,486
Street
Following decedent's death, Metals' real estate was sold on the dates indicated for the following cash prices: Property
Date
Purchase Amount
8399 Edgewater
11/84
$ 1,300,000
2360 Alvarado
5/85
1,020,000
823 Estabrook
11/84
195,000
Fabricators *429 Fabricators is a California corporation incorporated by decedent and others on October 27, 1960. Fabricators owned and operated the job shop metal fabrication business previously operated by Metals. Beginning September 1977, and through April 1, 1982, Metals owned 250 shares or a 50-percent interest in Fabricators. The remaining 50-percent interest in Fabricators was held by the Hall family (Will Hall and his three children, Robert, Susan, and Thomas). Fabricators' plant facility and principal place of business was at the Third Street, Oakland, California, property, which it leased from Metals. During 1976 through 1982, the company employed between 55 to 60 people a year. Ten of the employees were engaged in management and sales. From 1965 until June 1981, decedent and Will Hall managed Fabricators' business. Decedent was the company's president and he served primarily as chief estimator and general manager. Will Hall, who was an engineer, served in an engineering and estimating capacity. William Lenheim, decedent's son, joined Fabricators in 1962. He worked for the company in various capacities, eventually moving into management positions. Robert Hall joined the company late *430 in the 1970s. Like his father, Robert Hall had an engineering background. Shortly after joining the company, Robert Hall took an active role in its management. During June 1981, decedent retired from Fabricators and his son William Lenheim was then authorized to vote the Fabricators' stock which was owned by Metals. Metals, the Lenheim family members (decedent and his three sons), and the Hall family members (Will, Robert, Susan, and Thomas Hall) entered into a December 7, 1978, Restated Stock Purchase Agreement. The purpose of the agreement was to ensure that the respective family groups each maintained a 50-percent stock interest in Fabricators and that the Lenheim family members would retain a majority interest in Metals (the company through which the Lenheims held their 50-percent interest in Fabricators) so long as decedent or William Lenheim remained alive and Will or Robert Hall remained alive. The agreement generally restricted all transfers of Fabricators or Metals shares which would result in the Lenheim family members owning less than a majority stock interest in Metals. Before such a transfer could be made, successive options to purchase all of the Fabricators shares *431 held by Metals at the agreement's prescribed option price would exist in favor of the remaining members of the Lenheim family, then in favor of the remaining members of the Hall family and lastly, in favor of Fabricators. The Restated Stock Purchase Agreement, however, did not restrict intra-family gifts or bequests of Fabricators shares between the Hall family members or between the Lenheim family members. The agreement permitted intra-family sales of Fabricators shares between the Hall family members or between the Lenheim family members for amounts which did not exceed the agreement's option price. The agreement also permitted the Lenheims to dissolve Metals, so long as the Fabricators shares owned by Metals were distributed to the Lenheim family members. The Restated Stock Purchase Agreement provided for successive options at a prescribed option price for remaining members of the transferor's family group, members of the other family group, and Fabricators. The agreement also provided that upon a Fabricators shareholder's death, the remaining members of his family group would have the option to purchase his Fabricators shares. In the event such option was not exercised upon *432 death, Fabricators would be obligated to redeem the shares essentially at the option price prescribed in the agreement. Finally, the agreement provided, in certain circumstances, for the mandatory redemption of the Hall and Lenheim members' Fabricators shares. Upon the death of the last to die among Will Hall and Robert Hall, Fabricators would be obligated to purchase, and the Hall family members would be obligated to sell, essentially for the option price established under the agreement, all of the outstanding Fabricators shares held by all members of the Hall family. Similarly, upon the death of the last to die among decedent and William Lenheim, Fabricators would be obligated to purchase, and Metals and the Lenheim family members would be obligated to sell, essentially for the option price established under the agreement, all of the then outstanding Fabricators shares held by Metals and the members of the Lenheim family. The option purchase price for any Fabricators shares was to be based on an annual valuation of the company's shares. The valuation was to be approved by a vote of shareholders holding at least a 66.67-percent interest in Fabricators. This yearly valuation was *433 to be made within a reasonable time after the close of the company's September 30 fiscal year. The option price would be determined from the most recent annual valuation of the company's shares, with an adjustment for any net increases or decreases in the company's book value since that date. Pursuant to the Restated Stock Purchase Agreement, Fabricators' directors and shareholders had unanimously agreed that the company's shares had the following per share values on the dates indicated: Date
Value Per Share
September 30, 1979
$ 3,500
September 30, 1980
4,000
September 30, 1981
4,200 Early in 1982, after decedent decided Metals should acquire the New Roll Rite business, the Lenheims entered into negotiations to sell Metals' 50-percent interest in Fabricators, along with the Third Street real property, to Will and Robert Hall. On April 1, 1982, Metals sold its interest in Fabricators to Will and Robert Hall for a total of $ 1.1 million. Metals received a $ 500,000 cash down payment and a $ 600,000 promissory note for the balance. The note was personally guaranteed by the Halls and secured with the Halls' Fabricators shares. The note bore annual interest of 12 percent and called for monthly *434 payments of $ 13,346.70 over a 5-year period, commencing May 1, 1982. As part of the transaction, William Lenheim also received a 5-year consulting contract with Fabricators calling for $ 34,000 a year. The Roll Rite Business and New Roll Rite
Roll Rite, Inc. (Old Roll Rite), was a California corporation owned and operated by an individual named Carl Christensen. The company owned an industrial supplies business and the Edgewater real property which were acquired by Metals on April 1, 1982. Old Roll Rite was incorporated in 1945. During the times relevant to this case, Old Roll Rite was engaged primarily in the manufacture (through subcontractors), distribution and sale of wheels, casters, hand trucks, and related items. It sold these products primarily to end users of materials handling equipment. It owned numerous patents, as well as the special molds, tooling, and drawings, required to manufacture its products. The company also distributed other lines of wheels and casters produced by other manufacturers. Normally, no customer accounted for more than 5 percent of Old Roll Rite's annual sales and its sales averaged less than $ 500 per order. During 1981, Carl Christensen *435 was suffering from cancer and had been absent from Old Roll Rite for an extended period of time. His wife had never taken an active role in the company's business. In late 1981, Christensen became gravely ill and decided to sell his company. The Christensens and the Lenheims entered into negotiations for the sale of Old Roll Rite's assets, including the Edgewater real property. On April 1, 1982, Christensen's estate and his widow sold Old Roll Rite's assets to Metals for $ 1.5 million. The purchase contract allocated $ 515,000 to the Edgewater property and $ 985,000 to the Old Roll Rite business's other assets (plant equipment, current assets, and other assets, including intangibles and goodwill). The Lenheims and their representatives, however, believed the Edgewater property to be worth from $ 700,000 to $ 800,000. Prior to the sale, the Christensens withdrew approximately $ 100,000 of cash from Old Roll Rite. To facilitate the transaction, Old Roll Rite was liquidated and its assets were then distributed to Christensen's estate and his widow, who in turn transferred the assets to Metals. Metals exchanged its Third Street property for the Edgewater property and purchased the *436 other Old Roll Rite assets for its newly established, wholly owned subsidiary, New Roll Rite. In addition to receiving $ 515,000 cash for the Third Street property, the Christensens received $ 510,000 cash and a $ 475,000 promissory note from Metals. Interest of 12 percent per annum was payable on the note and the note was to be paid in 60 equal monthly installments of $ 5,644.35, followed by a balloon payment of $ 400,334.00 on June 1, 1987. Following the acquisition of the Old Roll Rite business, Metals permitted New Roll Rite to use the Edgewater property rent-free. New Roll Rite, until its sale in January 1984 to decedent's son William, made all payments on the Christensens' promissory note. New Roll Rite paid approximately $ 50,000 per year in interest on the Christensen note. William Lenheim served as New Roll Rite's president and managed its business. In mid-1982, he started an advertising campaign to develop new markets for the company's products. As part of this campaign, the company paid for advertising displays in telephone yellow page directories covering the San Francisco Bay area. He also added an outside sales staff comprised of three to four salesmen. These salesman *437 were furnished with company-owned vehicles, incurred travel expenses, and otherwise added to the company's overhead for items such as insurance and telephone expenses. In 1982 and 1983, William also caused the company to incur other expenditures for new internal accounting systems and a study of New Roll Rite's business by a consulting firm. Bernard Lenheim, decedent's other son, was also employed by New Roll Rite until January 1984, serving as the company's vice president and secretary. He managed the warehouse and coordinated the manufacturing activities of the company's subcontractors. Previous to joining New Roll Rite, Bernard was a self-employed contractor and had also worked at different environmental positions. Bernard was paid a salary of approximately $ 5,000 per month. He received the same salary as his brother, William, the company's president. Immediately prior to New Roll Rite's sale to William, Bernard resigned and was replaced by an individual who was paid $ 2,500 per month. In a sales agreement executed and dated January 17, 1984, but effective as of January 2, 1984, Metals sold all of New Roll Rite's outstanding shares to William Lenheim for $ 300,000. The entire *438 purchase price was payable under a promissory note with interest at 12 percent per annum and equal monthly installments of $ 4,261.51 over a 10-year period beginning February 1, 1984. Metals, effective January 1, 1984, assumed responsibility for the $ 475,000 promissory note to the Christensens. William, as part of the agreement, received up to 18 months of rent-free use of the Edgewater realty. The Edgewater property's fair market rental value was $ 8,000 per month. New Roll Rite had not been generally offered for sale to third parties. At the time of sale, New Roll Rite's fair market value was far in excess of the $ 300,000 price to be paid by William. During 1980 through 1983, Roll Rite's annual sales were between $ 1.5 million to $ 1.6 million. When Metals purchased the Old Roll Rite assets from the Christensens on April 1, 1982, the Lenheims and their representatives believed the acquired business and assets, exclusive of the Edgewater real property, were worth at least $ 698,000. New Roll Rite's balance sheet for the year ending December 31, 1983, reflects total assets of $ 800,334 (including $ 142,468 in cash or cash equivalents and $ 171,475 in net trade receivables) *439 and total liabilities of only $ 95,335, excluding the Christensen promissory note. Pursuant to the stock sales agreement, William was provided with the balance sheet and financial statements concerning New Roll Rite, as of December 31, 1983. Under the agreement, Metals warranted that no material adverse changes in New Roll Rite's financial position had since occurred and that the only changes would be those resulting from the carrying on of normal business operations. Metals also warranted that it had not received dividends or other distributions from New Roll Rite. Decedent's 1981, 1982, 1983, and 1984 Gift Tax Returns and the Estate Tax Return
Earl Cothran was decedent's accountant. Decedent's 1981, 1982, 1983, and 1984, gift tax returns and the estate tax return were prepared by Cothran's accounting firm, Cothran & Johnson. Additionally, the accounting firm prepared Metals' and New Roll Rite's corporate Federal income tax returns and financial statements. Decedent's gifts of Metals' shares were reported on his 1981, 1982, 1983, and 1984 gift tax returns. On these returns, decedent reported the gifted shares at the following per share values: Gift Tax Return
Reported Value Per Share
4th quarter 1981
$ 58.37
1st quarter 1982
58.37
1983
58.37
1984
71.11
Decedent *440 and his wife elected on each return, pursuant to the gift-splitting provisions of section 2513, to treat all gifts as being made one-half by each. Decedent did not report the May 1982 transaction in which Metals redeemed Steven Lenheim's 3,080 shares for a price of $ 120 per share on a 1982 gift tax return. He did not report Metals' January 1984 sale of New Roll Rite to William Lenheim. On the estate tax return, the 3,372 Metals shares owned by decedent at his death were reported to have a value of $ 239,783 or $ 71.11 per share. The Metals shares valuations were based on two appraisals performed by petitioner's valuation expert in August of 1981 and September of 1984. The first valuation concerned all of the company's outstanding shares as of July 24, 1981, and the second the 3,372 shares decedent owned at death. Notice of Deficiency and Respondent's Amended Answer
Respondent, in the notice of deficiency, determined there was a deficiency in petitioners' estate tax in the amount of $ 230,803. The notice of deficiency contained the following explanation: a. It is determined that the fair market value, at the date of decedent's death, of 3372 shares of common stock of * * * Metals *441 * * * was $ 120.00 a share, instead of $ 71.11 a share as reported on the estate tax return. Accordingly, the reported value of this stock is increased * * *. b. It is determined that the fair market value of all shares of common stock of * * * Metals * * * included in the adjusted taxable gifts is $ 120.00 a share, instead of value per share as reported on the gift tax returns. Accordingly, total adjusted taxable gifts is [increased] * * *. In determining decedent's total adjusted taxable gifts, respondent generally did not include the one-half of all the gifted Metals' shares and other gifts considered as made by decedent's wife under section 2513. In an amended answer, respondent asserted an increased deficiency in petitioner's estate tax. Respondent claimed that the 6,000 Metals' shares gifted by decedent in January 1984 had a value of $ 147 per share, rather than the value of $ 120 per share determined in the notice of deficiency. Respondent also alleged that the sale of New Roll Rite to William Lenheim constituted a further unreported gift by decedent. Respondent asserted that the company was worth $ 850,000, rather than the $ 300,000 for which it was sold. Valuations Made *442 by the Parties' Experts
[2]
Petitioner's and respondent's experts had greatly divergent opinions as to the values of the Metals' shares gifted by decedent and owned at his death. They also gave conflicting opinions on New Roll Rite's value. A. Valuations of Petitioner's Expert
1. Valuations of Metals' shares. Petitioner's expert appraised Metals on two occasions, first in August 1981 and again following decedent's death in September 1984. In his first appraisal he opined regarding the value of Metals' 19,272 outstanding shares as of July 24, 1981. This appraisal was requested by the Lenheim family which was contemplating recapitalizing the company and issuing preferred shares to decedent in exchange for his common stock. Petitioner's expert opined that on July 24, 1981, Metals shares had a fair market value of $ 58.37 per share. He valued the company's underlying assets to arrive at his $ 58.37 per share valuation as follows: Metal's investment in Fabricators
$   497,000 Metal's real estate
695,000 Metal's cash in excess of operating needs
200,000 Company's Adjusted Net Asset Value
1,392,000 Company's Net Asset Value
1,392,000 Less 19 percent corporate form discount
(264,480)
Enterprise Fair Market Value
1,127,520 Rounded
1,125,000 Enterprise Fair Market Value Per Share
58.37 (19,272 shares)
*443 Petitioner's expert did not use any discounts, such as discounts for minority interest and lack of marketability. Petitioner's expert, in his 1981 appraisal, ignored the annual values the Lenheim and the Hall families had placed on Fabricators shares pursuant to their 1978 Restated Stock Purchase Agreement. Additionally, his 1981 appraisal was completed before Metals sold its interest in Fabricators to the Halls for $ 1.1 million in April 1982. Petitioner's expert, at the time he made the 1981 appraisal, knew of the Fabricators stock purchase agreement. Pursuant to the agreement, the Hall and Lenheim families had agreed the Fabricators shares had a $ 4,000 value per share as of September 30, 1980. Petitioner's expert, further, was not a real estate appraiser and had attempted to value Metals' real estate "under protest." In the 1981 appraisal, he valued the company's real estate merely by capitalizing each property's annual lease income. Subsequently, a real estate appraiser hired by Metals during 1982 found that all three properties owned by the company were rented for amounts well below their current market rental values. Petitioner's expert did not adequately justify his corporate *444 form discount or explain how Metal's assets could be worth less to the company and its shareholders merely because the assets were held in corporate solution. In his 1984 appraisal, petitioner's expert opined that the 3,372 Metals' shares decedent owned at death were worth $ 71.11 per share as of April 17, 1984. He valued the company's underlying assets and arrived at his $ 71.11 per share valuation as follows: Metals' current assets and life insurance
$   262,852 Metals' notes receivable
605,432 Metals' real estate
2,103,971 Company's Total Assets
2,972,255 Metals' long term debt
(568,226)
Metals' other liabilities
(209,402)
Company's Total Liabilities
(777,628)
Company's Adjusted Net Asset Value
2,194,627 Company's Net Asset Value
2,194,627 Less 25 percent corporate form discount
(548,657)
Enterprise Fair Market Value
1,645,970 Rounded
1,645,000 Enterprise Fair Market Value Per Share
101.59 (16,192 shares)
Less 30-percent discount for shares'
minority interest status and lack of
marketability
30.48 Fair Market Value Per Share Of 3,372 Shares
71.11 Petitioner's expert did not adequately justify the corporate form discount he applied. His 1984 appraisal report covered only the valuation of the 3,372 Metals *445 shares decedent owned at death. At trial, petitioner's expert rendered an opinion as to the fair market values of the Metals shares gifted by decedent. His values for the gifted shares were, as follows: Date
Enterprise FMV
FMV
of Gift
Enterprise FMV
Per Share
Per Share *
11/24/81
$ 1,188,032
$ 61.65
$ 43.16
1/4/82
1,211,669
62.87
44.01
3/29/83
1,440,160
88.94
62.26
1/10/84
1,597,740
98.67
69.07
His Enterprise Fair Market Values for various dates were based on the values he determined as of July 24, 1981, and April 17, 1984. He used his 1981 Enterprise Fair Market Value figure of $ 1,127,520 as his starting point and added estimated appreciation to the underlying assets. He did not examine the assets held by the company as of the various gift dates. Instead, his figures were derived by prorating, over the 33-month period, the $ 520,000 difference between the values he determined in his 1981 and 1984 appraisals. He did this by assuming that during the 33 months between July 24, 1981, and April 17, 1984, the company's assets appreciated at a constant rate of $ 15,578 per month. [3] *446 When he performed his 1981 and 1984 appraisals, petitioner's expert was unaware of the 1979 Restrictive Stock Agreement entered into by the Lenheim family members concerning Metals' shares. He also disregarded the $ 120 per share price at which Metals redeemed Steven Lenheim's 3,080 shares in May 1982. His 1984 appraisal report contains the conclusion that Steven received a premium price in order to remove a dissident shareholder. 2. Valuation of New Roll Rite. Petitioner's expert estimated the January 1984 fair market value of New Roll Rite to be in a range from $ 300,000 to $ 415,000 and he selected a value of $ 350,000. He did not render an opinion as to New Roll Rite's 1983 value, *447 but stated the company had a $ 550,000 fair market value in April 1982. Petitioner's expert opined that Roll Rite, on March 31, 1982, had a fair market value of $ 550,000. The $ 550,000 value was reached by valuing the Edgewater real property at $ 950,000 as of March 31, 1982, and noting that Metals on April 1, 1982, had paid a combined price of $ 1.5 million for the business and the real estate. The real estate appraiser hired by Metals appraised the Edgewater property at $ 950,000 as of February 1984. Citing the 1984 appraisal of the property, petitioner's expert incorrectly (and perhaps improperly) relied upon the 1984 appraisal for a 1982 valuation stating that there had "been little movement in commercial real [estate] values in Oakland between March of 1982 and February of 1984." The real estate appraiser relied upon, however, had valued the Edgewater property at $ 750,000 as of May 1982. Petitioner's expert also valued New Roll Rite's assets and liabilities as of December 31, 1983. He concluded that the company had net assets with a fair market value of $ 414,031. No explanation was given regarding the 10-percent discount he applied to receivables or the 33-1/3-percent *448 discount he applied to the inventory. Further, he did not address whether goodwill was attributable to the business or whether it had a going-concern value, even though the company had sales of $ 1,529,139 for the year ending December 31, 1983, and 1984 sales had been projected in the same amount, by Cothran. B. Valuations of Respondent's Expert
1. Valuations of Metals shares. Respondent's expert valued the Metals shares decedent gifted in 1983 and 1984, and the 3,372 shares decedent owned at death. He determined they had the following values: Shares
Valuation Date
FMV Per Share
660
1/1/83 $ 116
6,000
1/1/84 147
3,372
4/17/84
116
In reaching his appraisal, he examined Metals' assets and liabilities on the valuation dates. A summary of respondent's expert's analysis of the Metals shares is attached to this opinion as Appendix A. (We note that some of the arithmetic is incorrect on Appendix A. The differences are insignificant and do not affect our ultimate findings.) Respondent's expert discounted the company's various notes receivable where the interest provided on the individual note was less than the current market rate. He valued the company's various notes payable at amounts essentially *449 equal to the outstanding note balances. He valued the real estate substantially by accepting the appraisals made by the real estate appraiser hired by Metals in 1982 and in 1984. That real estate appraiser determined the company's real estate was worth a total of $ 2,217,500 as of February 1984. Respondent's expert in valuing the real estate as of January 1, 1984, and as of April 17, 1984, reduced the $ 2,217,500 amount to take into account the fact that William Lenheim was permitted to use the Edgewater property rent-free for up to 18 months. The real estate appraiser determined the February 1984 market rental value of the Edgewater property to be $ 8,000 per month. Accordingly, respondent's expert made reductions of $ 144,000 ($ 8,000 X 18 months) in valuing the real estate as of January 1, 1984, and of $ 120,000 ($ 8,000 X 15 months) in valuing the real estate as of April 17, 1984. To determine the value for the real estate as of January 1, 1983, respondent's expert noted that the real estate appraiser had appraised the same individual properties at a total value of $ 1,835,000 as of early 1982, and later at a total value of $ 2,217,500 as of February 1984. He arrived at *450 his $ 2,026,000 value for the real estate by estimating that half of the $ 382,500 increase in value of the real estate would have occurred by January 1983. ($ 1,835,000 + $ 191,250 = $ 2,026,250) Respondent's expert applied a discount of 30 percent for lack of marketability and minority interest in valuing the 660 shares decedent gifted during January 1983. He noted that considered together the two gifts of 330 shares represented about a 4-percent interest in the company. He opined that a shareholder with 4 percent or less of the outstanding stock would have little say in running the company. He further noted that the company, in May 1982, had redeemed all of Steven Lenheim's 3,080 shares, which then represented about a 16-percent interest, for a price of $ 368,500 or approximately $ 120 per share. Respondent's expert concluded Steven had received a cash-equivalent price of about $ 114.50 per share and that the redemption had been at arm's-length. His report included copies of the correspondence between Steven and the company regarding the negotiation of the $ 368,500 redemption price. Respondent's expert also related that he had interviewed the petitioner William Lenheim who *451 confirmed that the same price would have been paid to any similar dissident shareholder and that family relationships played no role whatsoever in the negotiation of the redemption price. In arriving at his $ 114.50 per share cash-equivalent redemption price, respondent's expert discounted the $ 5,416 monthly installments required under the note Steven received by using a 15-percent interest rate. The cash-equivalent price reflected about a 25-percent discount from the net asset value of the company. See note 9, infra. Respondent's expert applied a 15-percent discount for lack of marketability and minority interest in valuing the shares gifted in January 1984 and the 3,372 shares decedent owned at death. He concluded that as of January 1, 1984, there were indications that the Lenheim family intended to dissolve Metals. (For example, New Roll Rite was being sold to William Lenheim. William was planning to devote his full time to that company. He also did not want his brother Bernard to remain with New Roll Rite. With its sale of its subsidiary, Metals would be a passive investment company. Further, following decedent's death, the brothers would have to liquidate the company *452 to pay the estate taxes. Decedent in his will provided that all of the estate taxes were to be paid first from the property left to the two. William and Bernard further acknowledged neither had the cash to pay the estate taxes without selling their Metals' shares.) 2. Valuations of New Roll Rite. Respondent's expert valued the New Roll Rite business enterprise using three methods: (1) A purchase price method; (2) an adjusted book value method; and (3) a capitalization of earnings method. Because the Christensen note was held within New Roll Rite during 1983, the January 1, 1983, values determined by respondent's expert were net of the note. When Metals sold the company to William Lenheim in January 1984, the Christensen note was transferred to Metals, which assumed the note effective January 1, 1984. Respondent's expert rendered opinions for the values of New Roll Rite on January 1, 1984, without considering the note by treating it as a separate liability of Metals. Appendix B to this opinion is respondent's expert's summary of his 1983 and 1984 New Roll Rite values. (We note that the averages computed in Appendix B are off by a small percentage difference, but that has not *453 affected our ultimate findings.) Respondent's expert incorrectly concluded that Metals, on April 1, 1982, paid a cash-equivalent price of $ 933,000 to acquire the New Roll Rite business and assets. He computed the $ 933,000 figure by discounting the $ 985,000 acquisition price for the business stated in the purchase contract. His appraisal report discloses that he was well aware that the purchase contract undervalued the Edgewater property at $ 515,000 and overvalued the Roll Rite business at $ 985,000. He correctly valued the Edgewater property at $ 750,000, not at $ 515,000. In determining the business's 1982 and 1983 earnings, respondent's expert considered the overstated operating expenses resulting from the overvaluation of the acquired depreciable assets. Although he properly adjusted the value of the real estate, he failed to make a corresponding adjustment to the business's value. Metals acquired the business and real property in an arm's-length transaction on April 1, 1982, for a combined stated price of $ 1.5 million, not for a price of $ 1,735,000. While respondent's expert believed that any of the three valuation methods utilized were reasonable, he believed more weight *454 should be given to the value determined under the capitalization of earnings method. He employed this method by examining the annual income and expenses for 1979 through 1983, as reflected in the financial statements of Old Roll Rite and New Roll Rite. He adjusted 1981 and 1982 income for the $ 56,548 inventory write-down taken on Old Roll Rite's 1981 amended tax return, but not otherwise reflected on its or New Roll Rite's financial statements. Appendix C to this opinion contains statements showing respondent's expert's adjusted income figures. Respondent's expert made adjustments to the expenses to properly reflect the business's actual annual earnings. These adjustments involved mostly the elimination of "nonrecurring or excessive items" as follows: (1) Eliminating the interest paid by New Roll Rite in 1982 and 1983 on the Christensen note; (2) eliminating the excessive compensation paid to Carl Christensen and his wife by Old Roll Rite in 1979, 1980, and 1981; (3) eliminating the excessive compensation paid to Bernard Lenheim by New Roll Rite in 1982 and 1983; (4) eliminating the one-time 1982 and 1983 advertising and promotional expenses incurred by New Roll Rite; (5) eliminating *455 the excessive depreciation resulting from the April 1, 1982, contract's overvaluation of the business; (6) eliminating the additional overhead expenses attributable to New Roll Rite's hiring of new outside salesmen in 1982 and 1983; (7) eliminating the 1983 expenses of Metals paid by New Roll Rite; (8) eliminating the expenses incurred in 1982 and 1983 by New Roll Rite for establishing new internal accounting systems, recruiting new salesman and commissioning a study of its business; and (9) adding the estimated economic rent which the business would incur to lease suitable facilities. Appendix D, attached to this opinion, is a schedule of respondent's expert's adjustments and adjusted earnings for the business. Respondent's expert noted that, during 1979 through 1981, the annual compensation paid Carl Christensen and his wife exceeded $ 150,000 per year, thereby reducing the corporation's taxable income to about $ 100,000. Mrs. Christensen was not actively involved in the company's business and respondent's expert was of the opinion that she should not have drawn any salary. He also thought that Carl Christensen's annual salary should have been $ 75,000 to $ 100,000, depending *456 on the business's profits for the year. Respondent's expert noted that Bernard Lenheim had no prior experience in the manufacturing or distribution of wheels and casters. Nevertheless, Bernard drew approximately $ 5,000 per month salary, similar to his brother William, New Roll Rite's president. After New Roll Rite was sold to William, Bernard was replaced by an individual who was paid $ 2,500 per month. Respondent's expert thought Bernard was overpaid and that his salary should have been $ 2,500 per year. He also noted that in 1982 and 1983, New Roll Rite engaged in a costly but unproductive advertising campaign to increase sales. The campaign did not measurably improve sales and was being scaled down by the end of 1983. In contrast, Old Roll Rite's advertising expenses never exceeded $ 11,000 per year. Respondent's expert thought that advertising expenses in 1982 and 1983 should not have exceeded $ 25,000 per year. Similarly, during 1982 and 1983, New Roll Rite incurred substantial additional overhead expenses related to its hiring of new salesmen. These salesmen were provided with new, company-owned cars, incurred travel and auto expenses, and otherwise added to other overhead *457 expenses, such as for insurance and telephone. By the end of 1983, New Roll Rite's management decided to cut back its sales force to reduce these expenses. The elimination of these salesmen would have saved the company $ 50,000 of overhead per year during 1982 and 1983. New Roll Rite incurred substantial expenses related to its purchase of the business, including new accounting systems and a study of the business by a consulting firm. Also, during the first 3 months of 1982, Old Roll Rite incurred an additional $ 29,000 in professional expenses related to the April 1, 1982 sale of its business. Respondent's expert was of the opinion that these items were also one-time, nonrecurring expenses and should not be considered part of the business's normal, ongoing operating expenses. Finally, respondent's expert noted that neither Old Roll Rite nor New Roll Rite paid any rent for occupying the Edgewater property. William Lenheim advised that no more than 8,000 to 10,000 square feet of the approximately 16,000-square-foot Edgewater facility was needed to operate the business. Based on the February 1984 appraisal of the Edgewater property's rental value, he estimated that a market rent *458 of $ 42,000 per year would be incurred to lease a 10,000-square-foot facility. Respondent's expert, after determining his adjusted earnings for the business during 1979 through 1983, calculated that the business, during this 5-year period, produced average before-tax yearly earnings of $ 195,000. He then selected a 25-percent capitalization factor and arrived at a value of $ 780,000 for the business. To the $ 780,000, he added $ 63,000, the economic benefit of 18 months of rent-free use William was permitted on the Edgewater property. Respondent's expert concluded that, under a capitalization of earnings approach, the business enterprise was worth $ 843,000 as of January 1, 1984. Respondent's expert made a number of observations in selecting his 25-percent capitalization factor. He observed that the business's sales and gross profits remained stable during the 1979 through 1983 period. While net profits fluctuated greatly due to uncontrolled overhead expenses, the business's sales and gross profits from year to year did not vary significantly. He also noted that this stability is reflective of the industry. Purchases of casters, wheels, and materials handling equipment, are *459 routine, as opposed to major expenditures for the industry's typical customers. These customers usually purchase such equipment on a periodic basis. The growth potential of the Roll Rite business was rather limited. Over the 5-year period from 1979 through 1983, sales and gross profits did not grow but remained stable. The market in the San Francisco area was highly competitive and other competitors were either larger or financially stronger. Despite this competition, the Roll Rite business had significant competitive advantages. The company (Old Roll Rite and later New Roll Rite) owned certain product distribution rights, patents and product drawings. It had a recognized name and logo and customer records and lists. Overall, it had a good reputation for offering quality products and the company was generally in strong financial condition during the 5-year period from 1979 through 1983. Current assets usually exceeded current liabilities by at least a 5-to-1 ratio. Aside from the Christensen note, the enterprise was basically free of any other debt. Respondent's expert observed that New Roll Rite's management possessed no experience in the materials handling industry. William *460 Lenheim, its president, was learning the business and had made some costly mistakes. Petitioner's Request to Bar The Revaluation of Decedent's Lifetime Transfers
At the time of trial, petitioner moved to bar respondent from revaluing decedent's 1981, 1982, 1983, and 1984 gifts of Metals shares and from claiming that the sale of New Roll Rite to William Lenheim constituted an unreported gift. Petitioner asserted that this Court lacks jurisdiction [4] *461 to consider such lifetime transfers because the notice of deficiency in this case pertains solely to estate tax. Petitioner alleged that the general 3-year period under section 6501(a) for assessing a deficiency in gift tax for each of the years 1981, 1982, 1983, and 1984 had run. Petitioner maintains that the values placed on the gifts in decedent's gift tax returns are binding on respondent. Petitioner sought to restrict the evidence admitted at trial to that concerning the value of the 3,372 Metals shares decedent owned at death. On December 8, 1988, this Court denied the motion. OPINION We consider here the values of a number of gifts made by the decedent during his life and the value of the remaining shares in a family-owned corporation at the time of his death. These issues all pertain to petitioner's estate tax liability. Preliminarily, we note that this Court has subject-matter jurisdiction over the valuation of the post-1976 lifetime gift transfers made by decedent. Section 2001 imposes an estate tax on the estate of every decedent who is a citizen or resident of the United States. Section 2001(b) prescribes how this tax is to be computed. In determining the amount of tax, decedent's post-1976 lifetime gift transfers must be considered. [5] *462 While petitioner also disputes the valuations asserted by respondent, its primary position is that section 2504(c) precludes respondent from revaluing any of the decedent's post-1976 transfers. Since we must reach the valuation of the decedent's various lifetime transfers only if section 2504(c) is inapplicable, we will first address the parties' arguments concerning the effect of that provision on petitioner's estate tax liability. I. Effect of Section 2504(c) on Estate Tax
Section 2001, which imposes the estate tax, is contained, along with other substantive estate tax provisions, in Chapter 11 of the Internal Revenue Code. Section *463 2504(c), however, is contained in Chapter 12, Gift Tax. [6] Petitioner contends that section 2504(c) [7] *464 is incorporated by reference into the section 2001(b) definition of the term "adjusted taxable gifts." Petitioner argues that since the decedent's post-1976 transfers are determined from the total amount of the taxable gifts he had made since December 31, 1976, within the meaning of section 2503, a gift tax provision, the gift tax valuation rule of section 2504(c) is applicable. Petitioner relies heavily on a decision by the United States District Court for the Western District of Missouri, Boatmen's First National Bank v. United States, 705 F. Supp. 1407 (W.D. Mo. 1988), wherein section 2504(c) was applied for estate tax purposes. Respondent, on the other hand, contends that the Federal District Court in Boatmen's First National Bank v. United States, supra, reached the wrong result. Respondent argues that section 2504(c), though applicable for gift tax purposes, has no effect with respect to the estate tax. Respondent contends that the express language of section 2504(c) does preclude revaluation of the prior gifts, but only for purposes of changing the gift tax. In a recent Court-reviewed opinion we addressed the identical issue raised here. Estate of Smith v. Commissioner, 94 T.C. (June 13, 1990). *465 In Smith we held that the bar of section 2504(c) was not applicable with respect to post-1976 gifts which are considered as part of adjusted taxable gifts under section 2001. Although we decided that the limitation of section 2504(c) did not preclude revaluation of the adjusted taxable gifts under section 2001(b)(1)(B) for estate purposes, we further held that the gift tax payable on such gifts under section 2001(b)(2) was to be adjusted in conformity with any increase in value. Accordingly, we agree with respondent other than with respect to the adjustment under section 2001(b)(2). II. Valuation of Metals' Shares Gifted by Decedent and Owned at Death
We now proceed to consider the value of the gifted shares for purposes of determining the estate tax liability. The parties' valuations are far apart for the Metals shares decedent gifted in 1981, 1982, 1983, and 1984, and for those which he owned at the time of his death. In determining decedent's post-1976 lifetime transfers, each of the gifts of shares is to be valued at its fair market value on the date gifted. Sec. 2512. The 3,372 shares decedent owned at death are to be valued at their fair market value as of April 17, 1984, *466 the date of death. Sec. 2031; sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the price at which property would change hands between a willing seller and a willing buyer, neither party being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 550-551 (1973). The shares of Metals stock were previously reported on decedent's gift tax returns and the estate tax return at the following values: Date
Reported Value Per Share
11/24/81
$ 58
1/4/82
58
1/83
58
1/84
71
4/17/84
71 We have set forth in detail in our findings information about the opinions rendered by each party's expert. Petitioner's expert opined that the shares in issue had the following values: Date
FMV Per Share
11/24/81
$ 43.16
1/4/82
44.01
3/29/83
62.26
1/10/84
69.07
4/17/84
71.11
Respondent, on the other hand, contends the Metals shares had the following values: Date
FMV Per Share
11/24/81
$ 109
1/4/82
109
1/83
116
1/84
147
4/17/84
116
Respondent's expert did not value the shares gifted in 1981 and 1982. [8] *467 A. Effect of 1979 Restrictive Stock Agreement on Values. Petitioner concedes the Restrictive Stock Agreement has no effect on the valuation of the 3,372 shares decedent owned at the time of death. The shares owned by decedent at death were expressly excluded from the agreement's coverage. Petitioner, however, contends that the restrictive agreement did have the effect of depressing the values of *468 the gifted shares. Petitioner does not contend that the agreement option price fixes the value of the gifted shares. Rather, it contends that the existence of the agreement, because of the options which it provided in the event a shareholder wished to transfer his shares, should be considered in determining values for the gifted shares. Respondent contends that the terms of the agreement had been ignored or waived on past occasions and were not, in any event, legally enforceable at the time the shares were gifted. Respondent further contends that the agreement had a tax avoidance purpose and should be disregarded in valuing the gifted shares. We agree with respondent that the Restrictive Stock Agreement concerning Metals' shares had been abandoned and was not enforceable by the time the gifts in issue were made. There is no indication that decedent, prior to making the gifts, had ever first offered the gifted shares to Metals, as was required in the restrictive agreement. Petitioner's expert testified he was not aware of the agreement when he performed both his 1981 and 1984 appraisals. In contrast, at the time he rendered the 1981 appraisal, he knew of the Restated Stock Purchase *469 Agreement between the Hall and the Lenheim families concerning Fabricators shares. If the Restrictive Stock Agreement on Metals' shares had still been in effect, the Lenheims or their representatives would likely have apprised petitioner's expert of the agreement's existence. Decedent also reported the gifted shares at values which also show the agreement no longer had any effect. Decedent, on his gift tax returns, accepted the values determined in the appraisals made by petitioner's expert who did not consider the restrictive agreement. The values placed on the 1981 and 1982 gifted shares greatly exceeded the shares' pro rata book value. The book value per share as of December 31, 1980, was $ 27.37; the book value per share as of December 31, 1981, was $ 28.36. Finally, the agreement did not appear to be considered when all of Steven Lenheim's shares in the company were redeemed in May 1982. Upon receiving Steven Lenheim's April 3, 1982, demand to have his Metals' shares redeemed, the remaining Lenheim family members retained an attorney to negotiate on their behalf with Steven. This attorney was a longtime friend of the decedent and was familiar with Metals' and decedent's *470 business affairs. The parties introduced into evidence the correspondence between Steven and the attorney concerning the redemption price to be paid. While Steven testified that the restrictive stock agreement was a legal impediment to him, there is no reference to the agreement by him or the attorney in their correspondence. The agreement, from all appearances, had no impact on the price Steven received. Steven initially demanded $ 368,500 for his shares. The other Lenheim family members, through the attorney, then made a counter offer of $ 350,000, but later agreed to the price demanded in the amount of $ 368,500. [9] *471 The Lenheims and their representatives, as of the times the gifts in issue were made, did not treat the agreement as though it was binding. Cf. Estate of Obering v. Commissioner, T.C. Memo. 1984-407. *472 Accordingly, a willing buyer and a willing seller would have given little weight, if any, to the restrictive agreement. B. Metals' Shares Gifted in 1981 and 1982
Because respondent's expert did not value the Metals' shares gifted in 1981 and 1982, petitioner argues that this Court must accept the values for the shares rendered by its expert. As trier of fact, we are not bound by an expert's opinion. Based on the other evidence in the record, we may reject an expert's testimony either entirely or in part. Commissioner v. Estate of Williams, 256 F.2d 152 (5th Cir. 1958); Estate of Fitts v. Commissioner, 237 F.2d 729 (8th Cir. 1956). There were a number of shortcomings in petitioner's expert's valuations of the Metals shares. We find his valuations to be seriously flawed and entitled to little weight. In his appraisals, petitioner's expert made incorrect assumptions and ignored highly relevant information concerning the properties valued. The $ 58.37 per share value he assigned to Metals' shares as of July 24, 1981, is unrealistically low. In his 1981 appraisal, he determined Metals' 50-percent stock interest in Fabricators was worth only $ 497,000 or approximately $ 1,988 per *473 share. While he testified he had been aware of the Restated Stock Purchase Agreement between the Lenheims and the Halls concerning Fabricators shares, petitioner's expert ignored the $ 4,000 per share value the Halls and the Lenheims themselves had placed on the shares as of September 30, 1980. Decedent, William Lenheim, Will Hall, and Robert Hall were intimately familiar with Fabricators and its business. All four were or had been officers and full time employees of Fabricators. Decedent, until his retirement in June 1981, had been Fabricators' president and had managed its day-to-day operations. Decedent and Will Hall had been jointly engaged in running Fabricators since the early 1960s. In annually valuing Fabricators shares for purposes of establishing the stock agreement's option price, both the Halls and the Lenheims were at arm's length and compelled to fairly value the shares. Upon the death of the last survivor of Will and Robert Hall, all of the Fabricators shares held by the Hall family would be redeemed at essentially the last agreed annual price. Similarly, upon the death of the last survivor of decedent and William Lenheim, all of the Fabricators shares held by the *474 Lenheim family or Metals would be redeemed at the same price. Another test and confirmation of the annual valuations of Fabricators shares is to be found in the Lenheims' subsequent sale of Metals' Fabricators shares to the Halls. Pursuant to the stock agreement, both families had agreed the shares were worth $ 4,200 per share as of September 30, 1981. Four thousand two hundred dollars per share was the stated price at which Metals sold its 250 Fabricators shares to the Halls on April 1, 1982. This transaction was an arm's-length sale between unrelated parties. As such, it constitutes highly probative evidence of the value of Metals' stock interest in Fabricators. In his 1981 appraisal, petitioner's expert also undervalued the real estate Metals owned in 1981. He had no expertise in appraising real property and attempted to value the properties. His valuation of Metals' real properties was achieved by capitalizing the annual lease income from the property. A real estate appraiser hired by Metals in 1982 determined that all the properties had been leased for a rent far below their fair rental values. Petitioner's expert did not adequately justify his use of a "corporate form" *475 discount. At trial, he testified such a discount was warranted because the tax deductions generated in the business's operations would not flow through to the shareholders. He also stated that the corporation could not sell its business or assets without the incidence of income tax. Upon cross-examination, he could not cite any principles of valuation for such a discount. In our view, the reasons petitioner's expert gave are inappropriate. Metals and Fabricators were successful, going enterprises. In 1981, there was little prospect either company would be liquidated. If Metals and Fabricators are valued as going concerns, the mere fact that each is a corporation does not diminish the value of the assets it owns. Petitioner's expert did not value Metals' underlying assets on the dates the shares were gifted. He instead relied on his previously determined enterprise values for the company on July 24, 1981, and on April 17, 1984. He derived his enterprise values for the company on the dates of gift by using July 24, 1981, enterprise values as his starting point. He calculated the amount by which his April 17, 1984, value exceeded his July 24, 1981, value. He then prorated this *476 difference to increase his enterprise value for the latter date covering the periods from July 24, 1981, and April 17, 1984. His enterprise values on the dates of gift were thus based on his July 24, 1981, figure and mechanically prorated increases. We find petitioner's expert's valuations to be well below the value of shares on each date shares were gifted. We do not accept the enterprise value petitioner's expert determined for Metals as of July 24, 1981. As discussed above, his 1981 appraisal was flawed. His value is much lower than the company's actual value on that date. Petitioner's expert's April 17, 1984, value is also too low because of his unjustified corporate form discount. We also note that Metals sold New Roll Rite in January 1984 for well below its then fair market value. The proper effect of this bargain sale on the date of gift was not taken into account by petitioner's expert. This is yet another shortcoming of his approach. We reject petitioner's expert's values for the shares gifted in 1981 and 1982. As of November 24, 1981, we find the 560 shares decedent gifted to each of his three sons had a fair market value of a $ 100.98 per share. We find the 330 shares *477 decedent gifted to each son on January 4, 1982, had a fair market value of $ 100.98 per share. We have reached these values after examining Metals' assets and liabilities as disclosed in the company's balance sheet for the year ending December 31, 1981. Appendix E to this opinion contains a copy of this balance sheet. We have valued the company's stock interest in Fabricators at $ 1.05 million, its real estate at $ 1.4 million, and its remaining net assets at $ 330,110 (using the book values at which its remaining assets and liabilities are listed on the company's balance sheet). In valuing the real estate, we have utilized the valuations of the properties made by the real estate appraiser hired by Metals. We have, however, discounted the appraiser's values to take into account the fact the properties were subject to leases paying well below each property's fair rental value. We thus determined the net asset value per share as of November 24, 1981, was about $ 144.26. Similarly, we determined the net asset value per share as of January 4, 1982, was also about $ 144.26. In valuing the gifted shares, we applied a 30-percent discount because of the shares' minority interest status *478 and lack of marketability. C. Values of Metals' Shares Gifted in 1983 and 1984
As explained above, we rejected petitioner's expert's valuations of the Metals' shares gifted in 1981 and 1982. His 1983 and 1984 valuations are also flawed. The enterprise value figures he used do not reflect the net asset values on the dates the shares were gifted. While petitioner's expert also valued New Roll Rite, we reject his valuations of that company for the reasons stated in our findings. Among other things, he incorrectly claimed Metals had paid $ 550,000 for the New Roll Rite business in 1982. Respondent's expert, in valuing the shares gifted in 1983 and 1984, thoroughly examined Metals' assets and liabilities on the pertinent dates. His valuation of the company real estate must be adjusted to reflect the less than fair rentals of two of the properties. Concerning respondent's expert's valuation for New Roll Rite, we do not accept his figure. When Metals acquired New Roll Rite's assets in April of 1982, it paid a cash-equivalent price of $ 698,000 for the assets, not the $ 933,000 determined by respondent's expert. [10] *479 While he used three methods to value New Roll Rite, respondent's expert stated that *480 any of the methods would produce a reasonable value for the company. In fact, his $ 780,000 value for the company under the earnings method does not greatly exceed the $ 698,000 cash-equivalent price which Metals previously paid to acquire the Roll Rite business in April 1982. We find that New Roll Rite, excluding the Christensen note, had a fair market value of $ 698,000 as of both January 1, 1983, and January 1, 1984. The company on these dates had a value equal to what Metals had originally paid in April 1982. We find the Metals' shares gifted in January 1983 had a fair market value of a $ 105.40 per share. We have accepted most of respondent's expert's values for Metals' various assets and liabilities. We have reduced his value for the company real estate to $ 1,974,000 to take into account the below-market leases to which the Alvarado and Estabrook properties were subject. New Roll Rite, exclusive of the Christensen note, we value at $ 698,000. We also find the value of the Christensen note to be $ 456,388, which is the remaining balance Metals owed on the note as of December 31, 1983. [11] We decided that Metals, as of January 1983, had net assets worth $ 2,438,140 . Since *481 16,192 shares were outstanding, the net asset value per share would be $ 150.58. We further applied a 30-percent discount because of the gifted shares' minority status and lack of marketability. This is the same discount used by both experts. We find the Metals' shares gifted in January 1984 had a fair market value of $ 127.12 per share. In valuing the company's assets and liabilities, we have accepted most of respondent's expert's valuations. We have, however, valued the company's real estate at $ 2,163,500. We disagree with respondent's expert's $ 144,000 reduction to the value of the Edgewater property. William Lenheim received up to 18 months rent-free use of that property in connection with his purchase of New Roll Rite. Metals' sale of New Roll Rite did not occur until January 17, 1984. That bargain sale transaction represented *482 a January 17, 1984, gift by Metals' other shareholders to William. It should not affect the valuation of the shares decedent gave on January 10, 1984. In valuing the real estate, we have taken into account the below market lease on the Alvarado property. No reduction is required for the lease on the Estabrook property. The record indicates that property after June 1983 was being rented on a month-to-month basis. The $ 1,000 monthly rent charged was not far below the property's estimated $ 1,206 monthly market rental value. We have also decided the value of New Roll Rite, exclusive of the Christensen note, at $ 698,000. We decide that Metals, as of early January 1984, had net assets of $ 2,744,385. This is a net asset value per share of about $ 169.49. We applied a discount of 25 percent because of the gifted shares' minority interest status and lack of marketability. Respondent's expert used a discount of 15 percent and petitioner's expert used a discount of 30 percent. We find that a discount of 25 percent is appropriate. After completion of its sale of New Roll Rite, Metals would essentially be a passive investment company. The company would no longer have any ownership *483 interest in or be an operating business. Respondent in his amended answer alleged the 1984 gifted shares had a value of $ 147 per share and claimed an increased deficiency in estate tax. He had the burden of showing the shares' value exceeded the $ 120 per share value determined in the notice of deficiency. Rule 142(b). We have reached a $ 127.12 per share valuation for the 1984 gifted shares based upon all the evidence available in the record. D. Metals' Shares Decedent Owned at Death
We find the Metals' shares decedent owned at his death had a fair market value of $ 108.59 per share as of April 17, 1984. We have accepted respondent's expert's values for the company's assets and liabilities, except for modifying his value for the company real estate. We found the real estate value to be $ 2,082,500 because of the below market lease on the Alvarado property. At decedent's death, Metals had net assets worth $ 2,197,971. The company's net asset value per share as of April 17, 1984, is $ 135.74. We then applied a discount of 20 percent to take into account the shares' minority interest status and lack of marketability. Respondent's expert used a discount of 15 percent; petitioner's *484 expert used a discount of 30 percent. We find a discount of 20 percent to be appropriate. III. Bargain Sale of Roll Rite
In his amended answer, respondent alleged New Roll Rite was sold to decedent's son William Lenheim for less than its fair market value and that the sale constituted an unreported gift by decedent. Since respondent is seeking an increased deficiency, he bears the burden of proof. Rule 142(b). Respondent has met his burden of showing the sale was not made for full and adequate consideration in money or money's worth. See sec. 25.2512-8, Gift Tax Regs. We have found New Roll Rite's fair market value at the time of its January 1984 sale greatly exceeded the price paid by decedent's son. As previously found, New Roll Rite in January of 1984 had a fair market value of $ 698,000. While the company was worth $ 698,000, William Lenheim paid a stated price of only $ 300,000. Moreover, Metals received a note payable over 5 years, secured by New Roll Rite's stock and no cash down payment from William. New Roll Rite's cash and receivables alone exceeded the $ 300,000 stated purchase price. New Roll Rite's other assets included sizeable inventories and a business which *485 had annual sales over the prior 4 years of $ 1.5 million to $ 1.6 million. Petitioner, nevertheless, argues that the sale was for full and adequate consideration in money or money's worth. In so doing, it relies on the "ordinary course of business" exception provided in section 25.2512-8, Gift Tax Regs. [12] We reject this contention. The record in this case reflects that during the last 2-1/2 years before his death, decedent was engaged in transferring *486 major portions of his estate to his sons. There was also a likely donative motive for the 1984 bargain sale of New Roll Rite to William Lenheim. Of decedent's three sons, William had been the one most involved in managing the decedent's business interests. William Lenheim had been an employee of decedent's other company, Fabricators, since 1962. He had worked his way up to a management position within that company. Following decedent's retirement from Fabricators, William was given the authority to vote the Fabricators stock held by Metals. When Metals sold its interest in Fabricators and acquired New Roll Rite, William became New Roll Rite's president. New Roll Rite had not been offered for sale to a third party. The $ 300,000 stated purchase price did not even represent one-half of the company's actual value. The sale was not a transaction made "in the ordinary course of business" within the meaning of section 25.2512-8, Gift Tax Regs. Kincaid v. United States, 682 F.2d 1220 (5th Cir. 1982). We must now decide the amount of the taxable gift which is attributable to this transaction. Where a corporation makes a gift to an individual, the company's shareholders are the ones *487 deemed to have made the gift. This rule is modified where the recipient is himself a shareholder, because he cannot be considered to have made a gift to himself. The transfer can be considered a gift from the other shareholders, but only to the extent it exceeds his own interest amount as a shareholder. Sec. 25.2511-1(h)(1), Gift Tax Regs. Respondent, on brief, concedes that the gift attributable to decedent from the transaction is tied to decedent's stock ownership interest in Metals as of the date New Roll Rite was sold. Respondent, however, argues that the sale actually took place on January 2, 1984, prior to the date decedent gave an additional 6,000 Metals' shares to his two sons. We disagree. Metals by then may have decided it would sell New Roll Rite to William Lenheim. It may also have been engaged in preparing to make such a sale. Such preparations would have included the drafting of the written stock sales agreement and the furnishing to William of New Roll Rite's financial statements as of December 31, 1983. An executory agreement to sell, however, is not a sale. Armstrong v. Commissioner, 6 T.C. 1166, 1173-1174 (1946), affd. 162 F.2d 199 (3d Cir. 1947).Moreover, *488 the contract document between William and Metals was executed at the transaction's closing on January 17, 1984. While the January 17, 1984, contract states New Roll Rite's sale would be treated as if effected on January 2, 1984, no sale for tax purposes occurred until January 17, 1984. The benefits and burdens of ownership did not pass to William until January 17, 1984, and we so hold. New Roll Rite had a fair market value of $ 698,000 on the date it was sold. We further accept respondent's expert's $ 238,000 valuation of the promissory note William Lenheim gave. Decedent owned approximately a 20.8-percent stock interest in Metals on January 17, 1984. We find decedent, as a result of Metals' bargain sale of New Roll Rite, made a gift to his son William in the amount of $ 95,680 (i.e., ($ 698,000 - $ 238,000) x .208). On their 1981, 1982, 1983, and 1984 gift tax returns, decedent and his wife elected, pursuant to section 2513, to treat all gifts made by them to others in each taxable period as made one-half by each spouse. The estate tax owed by petitioner is to be determined based on decedent and his spouse's elections of this gift-splitting treatment. Cf. sec. 2001(e). See *489 S. Rept. 95-745, at 89 (1978). Decision will be entered under Rule 155. APPENDIX A
Schedule 4 (Revised 12-2-88) NDR-CAL METALS, INC.
Stock Valuation Summary Effective Date
January 1, 1983
Gift Date March 29, 1983
Book Value
12/31/82
FMV
Note
Assets (Unconsolidated)
A
Cash & Equivalents
$   230,014
$   230,014
Accounts Receivable, net
294
294
Other Current Assets
9,017
9,017
Land, Bldgs, net
179,731
2,026,000
C
Note Rec.-Fabricators
539,127
508,000
E ,I
Stock - Roll-Rite
401,836
445,000
F
Note Rec.-W. Lenheim
-
-
Cash Value - Life Ins.
48,000
48,000
Tax Benefits
2,352
-
Total Assets
$ 1,410,372
$ 3,266,325
R
Liabilities
Note Pay - S. Lenheim
$   225,157
$   225,157
Note Pay - Christensen
-
-
Deferred Income Taxes
139,535
133,000
G
Accrued Taxes & Other
214,640
214,640
Total Liabilities
579,332
572,797
Equity (16,192 Shares)
$   831,040
$ 2,693,528
R
Pro rata Value/Share
$ 51
$   166
R
Discount Factor:
Minority Int. + Illiquidity
x   .70
30%
Fair Market Value/Share
$   116
R
x No. of Shares
x   660
4%
FMV of Block (rounded)
$ 77,000
R
Effective Date January 1, 1984
Gift Date
January 10, 1984
Book Value
12/31/83
FMV
Note
Assets (Unconsolidated)
A
Cash & Equivalents
$   112,787
$   112,787
Accounts Receivable, net
-
-
Other Current Assets
90,409
90,409
Land, Bldgs, net
166,147
2,073,500
C ,H
Note Rec.-Fabricators
438,232
418,00
E ,I
Stock - Roll-Rite
262,314
850,000
F
Note Rec.-W. Lenheim
-
-
Cash Value - Life Ins.
50,500
50,500
Tax Benefits
2,489
-
Total Assets
$ 1,122,879
$ 3,594,698
Liabilities
Note Pay - S. Lenheim
$   185,018
$   185,018
Note Pay - Christensen
-
455,307
Deferred Income Taxes
155,531
148,000
Accrued Taxes & Other
486
486
Total Liabilities
341,035
788,811
Equity (16,192 Shares)
$   781,844
$ 2,806,885
Pro rata Value/Share
$ 48
$    173
Discount Factor:
Minority Int. + Illiquidity
x    .85
15%
Fair Market Value/Share
$    147
x No. of Shares
x  6,000
37%
FMV of Block (rounded)
$ 882,000
Effective Date
April 17, 1984
Gift Date
Book Value
3/31/84
FMV
Note
Assets (Unconsolidated)
B
Cash & Equivalents
$   130,655
$   130,655
Accounts Receivable, net
3,030
3,030
Other Current Assets
80,914
80,914
Land, Bldgs, net
162,658
2,097,500
C ,H
Note Rec.-Fabricators
411,069
393,000
E ,I
Stock - Roll-Rite
-
-
Note Rec.-W. Lenheim
297,484
234,000
E ,D
Cash Value - Life Ins.
50,500
50,500
Tax Benefits
2,489
-
Total Assets
$ 1,138,780
$ 2,989,599
Liabilities
Note Pay - S. Lenheim
$   174,211
$   174,211
Note Pay - Christensen
452,000
452,000
Deferred Income Taxes
149,917
149,917
Accrued Taxes & Other
1,500
1,500
Total Liabilities
777,628
777,628
Equity (16,192 Shares)
$   361,152
$ 2,212,971
R
Pro rata Value/Share
$ 22
$    137
Discount Factor:
Minority Int. + Illiquidity
x    .85
15%
Fair Market Value/Share
$    116
x No. of Shares
x    3,372
21%
FMV of Block (rounded)
$ 391,000
*490 APPENDIX B
Schedule 5
(Revised 11/22/88) ROLL RITE CORPORATION
Valuation Summary
As of     As of     January 1,
January 1, 1984 A    1983 B   1. Cash-Equivalent Purchase Price, April 1, 1982
$ 933,000
$ 510,000
2. Adjusted Book Value Method.
A. Book Value of Equity, 1/1/84
$ 723,000
$ 402,000
B. Add Value of Accrued Income Tax Benefits
(1) NOL: $ 209,000 and $ 80,000 (at 40% and 30%)
84,000
24,000
(2) ITC: $ 19,000 (Amended 1983 Metals tax return)
19,000
19,000
C. Add Value of Free Rent for 18 months:
$ 3,500/mo. x 18 mos.
63,000
-
D. Indicated Value of Roll Rite
$ 889,000
$ 445,000
3. Capitalization of Earnings Method:
A. Capitalized Adjusted Earnings (Schedule 4)
$ 780,000
$ 483,000
B. Add Free Economic Rent,
(at $ 3,500/mo. x 18 months)
63,000
-
C. Indicated Value of Roll Rite
$ 843,000
$ 483,000
4. Concluded Fair Market Value of Roll Rite
Stock, (Average of 1,2,3 rounded)
$ 850,000
$ 445,000
*491 APPENDIX C
Schedule 2 ROLL RITE CORPORATION
Comparative Statement of Income ($ 000) A Roll Rite II
12 ME 12 ME 9 ME
12/31/83
12/31/82
12/31/82
Sales, net
$ 1,540 $ 1,599 $ 1,202 Cost of Sales:
Beg. Inventory
269 - - Purchases
868 1,026 Less [End Inventory]
(    231)
(    269)
Total Cost of Sales
905 994 757 Gross Profit
635 605 445 Adjusted B
661 501 General & Admin. Expenses:
Officers' Salaries
120 112 96 Salaries - Other
219 185 149 Salaries - Shop
21 21 21 Auto Expense
19 10 7 Depreciation
93 72 70 Insurance
18 20 12 Sales Promotion/Advtg.
83 63 63 Supplies
16 8 2 Payroll Taxes
25 27 17 Telephone
17 12 10 Employee Benefits
29 21 21 Other Expenses
65 98 42 Total Gen. & Admin. Exp.
725 649 510 Operating Profit [Loss]
(     90)
(     44)
(     65)
Adjusted B
12 (      9)
Other Income [Expense]
Expense Paid for Metals
(      9)
- - Interest Expense
(     56)
(     50)
(     50)
Interest Income
16 12 6 Other
- 2 1 Total Other Items
(     49)
(     36)
(     43)
Income (Loss) Before
Taxes
($   139)
($    80)
($   108)
Adjusted B
(     24)
(     52)
Gross Profit Margin
.41 .37 .37 Adjusted B
.41 .42 Roll Rite I
3 ME 12 ME 12 ME 12 ME 3/31/82
12/31/81
12/31/80
12/31/79
Sales, net
$ 397 $ 1,471 $ 1,668 $ 1,690 Cost of Sales:
Beg. Inventory
378 187 - - Purchases
245 883 - - Less [End Inventory]
(  385)
(    378)
(    187)
- Total Cost of Sales
237 691 1,132 1,096 Gross Profit
160 779 536 594 Adjusted B
723 General & Admin. Expenses:
Officers' Salaries
16 180 145 159 Salaries - Other
36 167 160 176 Salaries - Shop
- - 31 25 Auto Expense
3 11 8 3 Depreciation
2 8 11 16 Insurance
8 25 11 22 Sales Promotion/Advtg.
- 8 10 9 Supplies
6 4 12 4 Payroll Taxes
10 15 17 17 Telephone
2 9 7 7 Employee Benefits
- - 12 11 Other Expenses
56 44 34 47 Total Gen. & Admin. Exp.
139 471 458 496 Operating Profit [Loss]
21 308 78 99 Adjusted B
252 Other Income [Expense]
Expense Paid for Metals
- - - - Interest Expense
- - - - Interest Income
6 42 - - Other
1 2 - - Total Other Items
7 45 64 25 Income [Loss] Before
Taxes
$  28 $   352 $   142 $   124
Adjusted B
296 Gross Profit Margin
.40 .53 .32 .35 Adjusted B
.49 *492 APPENDIX D
Schedule 4  ROLL RITE CORPORATION
Valuation Adjustments to Earnings ($ 000), 1979-83
NOTE
1983
1982
1981
1980
1979
1. Adjusted Income
Before Taxes (Sch. 2)
$ 139
$ 24
$ 296
$ 142
$ 124 2. Adjust Expenses For:
A. Interest - Christensen
A *493  +  56
+  50
-
-
- Note
B. Compensation to B.
Lenheim
B
+  30
+  30
-
-
- C. Compensation - Carl &
Wilda Christensen
C -
-
+ 105
+  70
+  84 D. Advertising/Promotion
D +  58
+  38
-
-
- E. Depreciation
E +  79
+  58
-
-
- F. Other Overhead Expenses
F +  50
+  30
-
-
- G. "Paid for Metal"
G +   9
-
-
-
- H. Professional,
Recruitment,
and Consultants
H +  10
+  30
-
-
- I. Economic Rent
I -  42
-  42
-  42
-  42
-  42 Total Adjustments to
+ 250
+ 194
+  63
+  28
+  42 Expenses
Adjusted Pretax Profit
$ 111
$ 170
$ 359
$ 170
$ 166 Five-Year Average Pretax Profit
$ 195   / .25 = $ 780 (Enterprise Value)
Provision for income taxes
(at 40%)
(  78) Five-Year Average Net Profit
117  / .15 = $ 780 (Enterprise Value)
APPENDIX E NOR-CAL METALS
(A Corporation)
BALANCE SHEET
ASSETS
December 31,
1981
1980
Current assets:
Cash
$ 330,296
$ 208,502
Certificates of deposits
-- 56,045
Accounts receivable - trade
7,155
1,581
Accounts receivable - income tax refund
2,096
--  Accrued interest receivable
--  2,074
Prepaid insurance
553
270
Prepaid federal and state income taxes
3,372
--  Deferred income tax benefit
1,635
741
Total current assets
345,107
269,213
Property and equipment, at cost (Note 1 & 2)
Buildings
371,548
371,548
Furniture and fixtures
1,020
755
Paving
5,451
5,451
Land
84,979
84,979
462,998
462,733
Less accumulated depreciation
271,622
257,766
191.376
204.967
Other assets:
Investment (at cost) - Nor Cal Metal
Fabricators (Note 5)
25,000
25,000
Cash surrender value - officers life insurance
45,500
43,000
Total assets
$ 606,983
$ 542,180 LIABILITIES AND STOCKHOLDERS' EQUITY
Current liabilities:
Accounts payable - trade
$     166
$     183
Accrued payroll and payroll taxes
19,224
12,196
Federal and state income taxes payable (Note 4)
1,022
2,335
Dividends payable
40,085
--
Total current liabilities
60,497
14,714
Stockholders' equity:
Common stock - no par value
Issued and outstanding 19,272 shares
192,720
192,720
Retained earnings
353,766
334,746
Total liabilities and stockholders' equity
$ 606,983
$ 542,180
*494 The accompanying accountant's review report and notes to the financial statements should be read in conjunction with the financial statements. Footnotes
1. All section references, unless otherwise indicated, are to the Internal Revenue Code, as amended and in effect at the date of the decedent's death. All rule references are to the Tax Court Rules of Practice and Procedure.
*. Does not include tenant's option to extend lease for an additional 5-year term with rent to be increased on the basis of any rise in the commodity wholesale price index.↩
2. Although the expert opinions are not properly the subject of factual findings, we include an evaluation here for purposes of convenience only.↩
*. After application of a 30-percent discount for the gifted shares being a minority interest and lacking marketability.↩
3. Petitioner's expert recited that the 660 shares received in 1983 by William and Bernard Lenheim were gifted on Mar. 29, 1983. We have found that the shares were gifted during Jan. 1983. Decedent, on his 1983 gift tax return, reported each gift to have been made during "January 1983." We are not convinced the gifts were made on Mar. 29, 1983, as petitioner contends. The record reflects that Mar. 29 was only the date upon which new stock certificates covering the gifted shares were issued to William and Bernard.
4. We believe that petitioner acknowledges our jurisdiction to hear this matter, but expressed its assertion that we lack jurisdiction to mean that respondent was barred from assessing and collecting the tax so that this Court, in a sense, did not have subject matter jurisdiction over the substantive merits of the gift tax matters.
5. Sec. 2001(b) provides -- (b) Computation of Tax. -- The tax imposed by this section shall be the amount equal to the excess (if any) of -- (1) a tentative tax computed in accordance with the rate schedule set forth in subsection (c) on the sum of -- (A) the amount of the taxable estate, and (B) the amount of the adjusted taxable gifts, over (2) the aggregate amount of tax which would have been payable under chapter 12 with respect to gifts made by the decedent after December 31, 1976, if the rate schedule set forth in subsection (c) (as in effect at the decedent's death) had been applicable at the time of such gifts. For purposes of paragraph (1)(B), the term "adjusted taxable gifts" means the total amount of the taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts which are already includable in the gross estate of the decedent.↩
6. Sec. 2504(c) predates sec. 2001(b) and was enacted in 1954. See S. Rept. No. 1622, 83rd Cong., 2d Sess. 479 (1954). Sec. 2001, which is discussed in detail, infra↩, was enacted as part of the Tax Reform Act of 1976, 90 Stat. 1520, 1846.
7. Sec. 2504(c) contains the following language: (c) Valuation of Certain Gifts for Preceding Calendar Periods. -- If the time has expired within which a tax may be assessed under this chapter or under corresponding provisions of prior laws on the transfer of property by gift made during a preceding calendar period, as defined in section 2502(b), and if a tax under this chapter or under corresponding provisions of prior laws has been assessed or paid for such preceding calendar period, the value of such gift made in such preceding calendar period shall, for purposes of computing the tax under this chapter for any calendar year, be the value of such gift which was used in computing the tax for the last preceding calendar period for which a tax under this chapter or under corresponding provisions of prior laws was assessed or paid.
8. Respondent bases his contended values for the shares gifted in 1981 and 1982 on Metals' net assets consisting of: Real estate worth $ 1.6 million (the combined values at which the appraiser hired by Metals had appraised the company's real estate as of Jan. 1982), a stock interest in Fabricators worth $ 1.05 million (the cash-equivalent price at which Metals sold the shares to the Halls on Apr. 1, 1982), and cash and miscellaneous assets of $ 345,107 (consisting of $ 330,296 cash or cash equivalents and $ 14,811 of miscellaneous assets as disclosed in Metals' balance sheet for the year ending Dec. 31, 1981). See Appendix E to this opinion. Respondent asserts the net asset value per share on these dates was about $ 155. ($ 2,995,107 divided by the 19,272 total shares outstanding.) He then suggests applying a discount of 30 percent for the gifted shares' minority interest status and lack of marketability to arrive at his $ 109 value per share.
9. The body of Steven Lenheim's Apr. 3, 1982, letter to Metals' board of directors states: I have put a great deal of thought and investigation into studying the performance of the Board of Directors * * * relating to the purchase of [the Roll Rite business] and including the restructuring of * * * Metals over the past four months. It is my conclusion that steps have been taken by the Directors which are not in my interests as a shareholder and which could have serious financial consequences affecting the value of my shares in the future. Therefore, under the by-laws of the Corporation I am making a demand that all my existing shares be redeemed by the Corporation within thirty days. If the Corporation is unable to do so then I will offer such stock to the shareholders as individuals. If they are unable or unwilling to buy my shares then I will seek outside [counsel] to secure their values. In order for me to properly set a price for my outstanding shares I have had to rely on information provided by members of the Board of Directors and such information may be suspect. However, for the sake of speed and with the least amount of negotiation a price of * * * ($ 460,649.00) seems, at this time, to cover those known assets as listed on the enclosed sheet. Should the Corporation wish to use those values and guarantee there are no misrepresentations I would discount the value by twenty (20) percent to a buy-out price of * * * ($ 368,500). If unable to pay cash then these terms will need to be negotiated and another figure will be decided by those concerned.↩
10. The overall stated price of $ 1.5 million for the Edgewater property and the New Roll Rite assets was partly paid by means of a $ 475,000 note. Respondent's expert determined the note had a market value of $ 423,000 on Apr. 1, 1982. Accordingly, a $ 1,448,000 cash-equivalent price was paid for the Edgewater property and the assets. This $ 1,448,000 cash-equivalent price we have decided was allocated $ 750,000 to the Edgewater property and $ 698,000 to the New Roll Rite assets. Respondent does not argue that the rule enunciated in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), applies to preclude valuing the assets at any amount other than $ 985,000 stated in the purchase agreement. In this case, respondent relies on his expert's valuation of the assets. Moreover, the Danielson rule would not apply in any event. The exchange document for the Edgewater property and the purchase agreement for the assets constitute, for practical purposes, a single contract. See Stryker Corp. v. Commissioner, T.C. Memo. 1982-504; United Elchem Industries, Inc. v. Commissioner, T.C. Memo. 1981-376↩.Respondent has chosen to disregard the allocations made in this contract.
11. In valuing the company's liabilities as of Jan. 1, 1983, Jan. 1, 1984, and Apr. 17, 1984, respondent's expert did not discount the Christensen note payable or the Steven Lenheim note payable. Essentially, he valued each liability at an amount equal to the remaining note balance owed. This is a conservative approach and is to petitioner's advantage.↩
12. Sec. 25.2512-8, Gift Tax Regs., in pertinent part, states: Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts but, embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth. * * *↩
A. Source: U.S. Income Tax Returns (Stmt. 5 and 7).↩
C. Lawyers Appraisal Service.↩
E. Total principal balance of note receivable.↩
I. Fabricators 12 percent Note discounted at 15%/annum.↩
F. Source: appraisal of Roll Rite. ↩
R. Revised, 12-2-88.↩
G. On Gain on installment sale of Fabricators (Contract Portion).↩
H. Values from Corporate Procedures, Inc.↩
B. Source: Financial Statement compiled by Cothran & Johnson, CPA's.↩
D. Discounted at 18 percent/yr.↩
A. Excludes Christensen Note Payable which was assigned to Nor-Cal Metals effective January 1, 1984.↩
B. Net of Christensen Note Payable.↩
A. Source: Financial Statements of Roll Rite.↩
B. Adjusted to reflect $ 56,548 write-down of inventory, per 1981 Amended Tax Return. Beginning inventory (4/1/82) not adjusted to reflect $ 56,548 write-down. Thus, reported gross profit of 9-ME 12/31/82 is understated by $ 56,548.↩
A. Note was assigned to Metals effective January 1, 1984.
B. Bernard Lenheim was replaced in January 1984 by an employee who was paid $ 2,500/mo. ($ 5,000 - $ 2,500 = $ 2,500/mo.).↩
C. Adjusted to $ 75,000/year. Mr. Christensen was absent from business much of 1981 due to illness. Wilda Christensen was not active in the business.↩
D. Reduced to $ 25,000 per year, 1982, 1983.↩
E. Adjusted to cost basis of $ 100,000 and seven-year useful life, or $ 14,000/yr. rounded.↩
F. To reflect reduction in personnel, autos, travel, etc., per minutes of 12/83 and 1/84. Estimated at $ 50,000/yr.↩
G. See "Other Income (Expense)," Schedule 2.↩
H. Includes accounting systems implementation, Williams Associates, recruiting for salesmen, and cost of professional services related to the purchase of Roll Rite I.↩
I. Based on actual needs of Roll Rite: 10,000 sq. ft. x .35/ft x 12 mos. = 42,000/yr.↩